After Remand from the Alabama Supreme Court

PER CURIAM.
In 2009, Lam Luong was convicted of five counts of murder made capital because he killed his four children, all under the age of 14 years, by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(15) and § 13A-5-40(a)(10), Ala.Code 1975. Luong was sentenced to death. On appeal, this Court reversed Luong’s convictions after finding that Luong had been denied his constitutional right to a impartial jury when the circuit court denied his motion for a change of venue based on pretrial publicity. See Luong v. State, 199 So.3d 98 (Ala.Crim.App.2013) (“Luong I”). We also held that the circuit court erred in denying Luong’s motion for funds to investigate mitigating evidence and in admitting a videotaped reenactment of the murders. The State petitioned for a writ of certiorari to the Alabama Supreme Court. The Supreme Court reversed this Court’s decision and remanded the case for proceedings consistent with that court’s opinion. See Luong v. State, 199 So.3d 139 (Ala.2014) (“Luong II"). In this Court’s opinion reversing Luong’s convictions, we did not address some of the issues raised in Luong’s original brief to this Court. We now consider the remaining issues that were' raised but that wéré not previously addressed by this Court. The facts surrounding Luong’s convictions are set out in detail in both this Court’s opinion and the Supreme Court’s opinion. Luong was convicted of murdering his four children — four-month-old Danny Luong, one-year-old Lindsey Luong, two-year-old Hannah Luong, and three-year-old Ryan Phan — by throwing them off the Dauphin Island Bridge in Mobile County. Luong confessed to murdering his four children and led police to where *184 he threw the children off the bridge. The coroner testified that Danny, Ryan, and Lindsey died of blunt-force trauma and asphyxia due to drowning and that Hannah’s cause of death was drowning. The jury' unanimously recommended that Luong be sentenced to death, and the circuit court followed the jury’s recommendation.

Standard of Review

Because Luong has been sentenced to death, this Court must review the lower-court proceedings for “plain error.” Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that, was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). In discussing the scope of the plain-error standard, the Alabama Supreme Court has stated:
“ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity .of the judicial proceedings.” ’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v, Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). ' “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise-result.”” Ex parte Land, 678 So.2d 224, 232 (Ala.1996) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error ‘has or probably has adversely affected the substantial rights of the appellant.’ Rule 45A, Ala. R.App. P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’ Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002).[1]
Many of the issues raised in Luong’s brief were not first presented to the circuit court. “[Luong’s] failure to object at trial does not bar our review of these issues; ... it does weigh against any claim of prejudice he now makes on appeal.” Brooks v. State, 973 So.2d 380, 387 (Ala.Crim.App.2007).
*185 With these principles in mind, we review the remaining issues raised in Luong’s brief.
I.
First, Luong argues that the circuit court erred in failing to conduct an investigation into juror misconduct that allegedly occurred during the voir dire proceedings. Specifically, he argues that the circuit court erred in not granting his motion for a mistrial after he asserted a claim of juror misconduct and the circuit court failed to conduct an investigation into the claim.
The record shows that during voir dire examination Luong’s counsel notified the circuit court that juror E.L. had indicated on her juror questionnaire that she had heard other prospective jurors talking about the case. The following discussion occurred:
“The Court: There was something in your questionnaire that indicated that you had heard from another juror. Is that right?
“[E.L.]: When you sent the two panels upstairs right after we were put in panels and sent two panels upstairs to possibly sit on a case in Judge [Joseph] Johnston’s court—
“The Court: Okay.
“[E.L.] — which ended up being settled, but in the interim we stood there like ducks in a row for like 30 minutes in the hall waiting to see what was going to happen. And there was just a few people on the panel standing next to me talking about, you know, what' they would do.
“The Court: Okay. What did they say they would dp?
“[E.L.]: Well, they were talking about that the death penalty would be too quick, and that they were thinking of other items, you know, like hanging in Bienville Square, whipping with reeds, that kind of thing.
“The Court: All right. You heard that. That wasn’t your mind-set, was it?
“[E.L.]: No.
“The Court: You just heard.
“[E.L.]: I’m just standing there going la, lá, la.'
“The Court: Has it affected you in any way that you heard that? Would it change your opinion with regard to guilt or innocence?
“[E.L.]: No. I just — like I say, I heard that, and I felt the need to write it down, you know.
“The Court:. Thank you. And you have told me that you have heard things about this . case or at least most people have. And you have also indicated to me that you could lay that aside and put it aside and judge this case on the evidence?
“[E.L.]: Correct.

"....

“[Defense counsel]: Ma’am, the jurors that you heard, I wasn’t clear about that, that you heard making these statements—
“[E.L.]: Yes, sir.
“[Defense counsel]: — were they part of the people who have been in here?
“[E.L.]: Yes, sir. And I can’t give you names because there was, what, a hundred and fifty — something of us.
“[Defense counsel]: Do you know how many people were chit-chatting about that out of the jury panel?
“[E.L.]: Oh, about three,
[[Image here]]
“[Defense counsel]: Given this juror’s statements about what conversations were going on out in the jury panel, we would at this time, her saying that people were, making statements about he should be hung or whipped or thrown off *186 the bridge or whatever that was, at this point we would move for a mistrial on the grounds that the jury panel is tainted. We don’t know who it is. We cannot weed these people out. We can’t find out who it is. She can’t identify them, but they are out there. And with that, we submit that the jury panel is tainted and we would ask for a mistrial and start over.
“The Court: Okay. So that the record is clear about how — where and how — when that occurred, when I empaneled the jury on Monday morning, before even this group was told that they were going to fill out questionnaires and as to what case they may be hearing, Judge Johnston was the only judge in the courthouse that required a group of jurors be sent to him.
“They were placed in panels and she apparently was on one or two or three of the panels that were sent down to Judge Johnston’s court. And it sounded to me like when they were standing in the hall waiting to go into Judge Johnston’s court that she heard that.
“Now, whether or not all of these people that were on that jury, some of them got on this panel, I have no idea. Because many of them I excused because they couldn’t stay longer than two-and-a-half weeks or couldn’t stay two-and-a-half weeks. So they may or may not have been on here.
“But one thing I know for sure, nobody has indicated what she said on these panels. And I’m not going to grant mistrial based on speculation. I haven’t heard any evidence — any evidence whatsoever that anyone has been tainted. She said she certainly wasn’t.”
(R. 902-06) (emphasis added). The three jurors were never identified and juror E.L. indicated that the conversation she had overheard would have no affect on her ability to be impartial.
“In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion ‘where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark.’ ”
Holland v. State, 588 So.2d 543, 546 (Ala.Crim.App.1991). “There is no per se rule requiring an inquiry in every instance of alleged [juror] misconduct.” United States v. Hernandez, 921 F.2d 1569, 1577 (11th Cir.1991). “[A] trial judge ‘has broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences.’” United States v. Peterson, 385 F.3d 127, 134 (2nd Cir.2004), quoting in turn United States v. Thai, 29 F.3d 785, 803 (2d Cir.1994).
“ ‘The trial court’s decision as to how to proceed in response to allegations of juror misconduct or bias will not be reversed absent an abuse of discretion.’ United States v. Youts, 229 F.3d 1312, 1320 (10th Cir.2000). ‘[I]t is within the trial court’s discretion to determine what constitutes an “adequate inquiry” into juror misconduct.’ State v. Lamy, 158 N.H. 511, 523, 969 A.2d 451, 462 (2009).”
Shaw v. State, [Ms. CR-10-1502, July 18, 2014] — So.3d —, — (Ala.Crim.App.2014).
Here, the alleged juror misconduct occurred more than one day before voir dire examination in Luong’s case and not in the middle of Luong’s trial after a jury had already been selected. The Connecticut Court of Appeals in State v. Vazquez, 87 Conn.App. 792, 867 A.2d 15 (2005), held, in deciding a juror-misconduct claim that occurred during voir dire, that the voir dire process itself was sufficient to uncover bias. The court stated:
*187 “In [State v.] Ross, [269 Conn. 213, 849 A.2d 648 (2004),] our Supreme Court stated: ‘When an allegation is made ... that a venire panel has been tainted, voir dire itself provides a means to uncover bias. Therefore, such an allegation does not necessarily require an independent inquiry by the court. Although we recognize that, as in the present case, there may be circumstances in which the trial court perceives a need for an inquiry exceeding the scope of voir dire, we conclude that, as in [State v.] Brown, [235 Conn. 502, 668 A.2d 1288 (1995),] the form and scope of the court’s inquiry, if any, into possible taint of a venire panel before voir dire depends on the circumstances of the case and is to be determined by the trial court within the exercise of its discretion.’ State v. Ross, supra, at 248, 849 A.2d 648.
“Here, the court conducted a preliminary inquiry of counsel and the defendant and was satisfied that there was no taint. Furthermore, the court was concerned that a more in depth inquiry that extended to the venirepersons would create a taint in the venire pool. It is clear that the court considered the facts .before it and determined that the most appropriate response was not to question the venirepersons directly on the issue. The court did not limit counsel, however, from asking questions of the venirepersons that touched on the issue either directly or indirectly. Accordingly, we conclude that the court did not abuse its discretion in inquiring only of counsel and the defendant about the possible taint and that the court’s actions adequately protected the defendant’s right to an impartial jury.”
87 Conn.App. at 805-06, 867 A.2d at 25.
In this case, the circuit court did conduct a hearing into the juror-misconduct claim and questioned the juror after she indicated on her questionnaire that she had heard three jurors discuss possible punishment for Luong. Although the circuit court did not poll every one of the remaining 154 prospective jurors to identify what jurors had made these comments, to do so would have been a futile act. In addressing the scope of the voir dire examination in this case, the Alabama Supreme Court specifically held that the voir dire was sufficient to reveal any biases or prejudices against Luong. See Luong II. The voir dire process “provided the means to uncover bias,” and the circuit court was not obliged to conduct a more extensive investigation into Luang’s claim of juror misconduct. The circuit court did not abuse its discretion in its method of handling this claim. Luong is due no relief on this claim.
II.
Luong next argues that the circuit court erred in reversing its initial ruling granting Ling's motion to sequester the members of his jury.
The record reflects that before trial Luong moved that his jury be sequestered because of the extensive publicity surrounding the case. (C.R.119.) The circuit court granted that motion. (R. 291.) Luong then indicated that he wished to plead guilty. The following discussion occurred:
“[Defense counsel]: Judge, now, given the publicity that’s out there, and there’s going to be more of it I assume, we would renew our motion for the sequestered jury.
“The Court: I was afraid you were going to say that. I told this jury that they would not be sequestered. I can-celled all of the rooms at the hotel. That may be something we can fix.
*188 “[Prosecutor]: Judge, we would ask that they not be sequestered.
“The Court: I’m not sure that I’m going to sequester them now. I was doing that at the — Did y’all ask — who asked—
“[Prosecutor]: No, they did—
“[Defense counsel]: We did.
“[Prosecutor]: We asked that they not be. Our position is that even though there has been publicity, that they could receive adequate instructions from the Court not'to look at—
“The Court: I guarantee you I’m going — I will give them — I was going to do that whether they were sequestered or not.
“[Prosecutor]: Right.
“The Court: But I think the fact that [Luong] has caused this to occur—
“[Prosecutor]: Right.
“The Court: — I will have enough alternates, in the event something does happen with regard to a juror hearing .or seeing or reading something that they shouldn’t, that we’ll be able — And that is to say that — whether or not we can get a jury at all. I’m going to make that determination at the appropriate time.
“But I am going to deny your motion to sequester the jury.”
(R. 386-87.)
Section 12-16-9, Ala.Code 1975, as amended in 1995, addresses the sequestration of a jury and states, in pertinent part:
“In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, •require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate, A motion to separate or sequester shall not be made within the hearing of the jury, and the jury shall not be informed which party, if any, requested separation or sequestration.”
(Emphasis added.) This section applies to all felony cases, even those involving the death penalty. See Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007) (“Even in a capital case there is no requirement that a court sequester the jurors during the trial.”); Broadnax v. State, 825 So.2d 134, 155 (Ala.Crim.App.2000) (“[T]he trial court ha[s] complete discretion to sequester the jury [in capital case].”).
Rule 19.3(a), Ala. R.Crim. P., was amended effective December 1, 1997, to make the Rule consistent with § 12-16-9,[2] Rule 19.3(a), how provides, in pertinent part:
“(1) In the prosecution of any felony case, the trial court, in its discretion, may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation.
“(2) The court may, at any time, on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever the jurors leave the jury box, or the court may allow the jury to separate. A motion to separate or sequester *189 shall not be made within the hearing of the [jury, and the jury shall not be informed which] party, if any, requested the separation or sequestration.”
Now and at the time of Ling's trial, “[t]he decision to grant or deny a motion to sequester the jury during trial is within the sound discretion of the trial court.” Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007). Consistent with the provisions of Rule 19.3(b), Ala. R.Crim. P.,[3] the circuit court admonished the jurors on numerous occasions not to read anything concerning the case and not to discuss the ease among themselves or with anyone else. The circuit court did not abuse its considerable discretion in ultimately denying Luang’s motion to sequester the jury. Luong is due no relief on this claim.
III.
Luong next argues, that the prosecutor violated the United States Supreme Court’s decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using its peremptory strikes to remove black prospective jurors and female jurors from the venire.
The United States Supreme Court in Batson held that it was a violation of the Equal Protection Clause of the United States Constitution for the State to remove a black prospective juror from a black defendant’s jury solely based on the juror’s race. This holding was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to. defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based strikes in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Alabama Supreme Court in White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993), extended this protection to white prospective jurors.
The record shows that, after jurors were removed for cause, 104 prospective jurors remained on the venire. The State used 33 of its 46 strikes to remove women and 13 strikes to remove men. The State used 19 of its 46 strikes to remove black prospective jurors and 1 strike to remove a juror whose race was designated as “other.” The jury was initially composed of 8 men and 4 women; however, one women was removed and replaced with a male alternate. Luong’s final jury consisted of 9 men and 3 women — 7 of whom were black and 5 of whom were white. Luong did not make any form of a Batson objection after his jury was struck. Therefore, we review these Batson claims for plain error. See Rule 45A, Ala. R.App, P.
We have stated that to find plain error in the context of a Batson claim, “[t]he record must raise an inference that the state engaged in ‘purposeful discrimination’ in the exercise of its peremptory challenges.” Guthrie v. State, 616 So.2d 913, 914 (Ala.Crim.App.1992). “To rise to the level of plain error, the *190 claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” See Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998). Where the record contains no indication of a prima facie case of discrimination there is no plain error in regard to a Batson claim. See Gobble v. State, 104 So.3d 920, 949 (Ala.Crim.App.2010).
In determining whether a prima facie case of discrimination has been established, we consider the following:
“In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he .belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch, 526 So.2d 609, 622-623 (Ala.1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor’s questions during voir dire, including desultoiy voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike African-Americans; and the use of peremptory challenges to dismiss all or most black jurors.”
Madison v. State, 718 So.2d 90, 101-02 (Ala.Crim.App.1997).
Luong asserts that the number of women struck by the State was sufficient, in itself, to establish a prima facie case of gender discrimination. However, this Court has recognized that numbers alone are not sufficient to establish a prima facie case of discrimination under Batson.
“The only ground [the appellant] offers in support of his allegation is that the State used 9 of its 14 strikes to remove African-American venire-members. ‘Alabama courts have repeatedly held that numbers alone are not sufficient to establish a prima facie case of discrimination.’ Vanpelt v. State, 74 So.3d 32, 53 (Ala.Crim.App.2009).”
Reynolds v. State, 114 So.3d 61, 86 (Ala.Crim.App.2010). Many other courts have reached this same conclusion. See Duffie v. State, 301 Ga.App. 607, 612, 688 S.E.2d 389, 394 (2009) (“ ‘[Njumbers alone may not establish a disproportionate exercise of strikes sufficient to raise a prima facie inference that the strikes were exercised with discriminatory intent.’ ”); State v. Duncan, 802 So.2d 533, 550 (La.2001) (‘“[I]t is important that the defendant come forward with facts, not just numbers alone, when asking the district court to find a prima facie case.’ ”); Rose v. State, 72 Ark.App. 175, 182, 35 S.W.3d 365, 368 (2000) (“[A] movant cannot establish a pri-ma facie case of discrimination on the basis of mere numbers alone.”); McFarland v. State, 707 So.2d 166, 181 (Miss.1997) (“[I]t is important that the State come forward with facts,' not just numbers alone, when asking the trial court to find a prima facie case.”); People v. Bohanan, 243 Ill.App.3d 348, 350, 183 Ill.Dec. 788, 612 N.E.2d 45, 47 (1993) (“‘It is settled that a Batson prima facie case cannot be established merely by the numbers of black venireper- *191 sons stricken by the prosecution.’ ”); Commonwealth v. Hardy, 775 S.W.2d 919, 920 (Ky.1989) (“Batson requires more than a simple numerical calculation. Numbers alone cannot form the only basis for a prima facie showing.”).
Luong also argues that there is evidence of disparate treatment between female jurors and male jurors and between white jurors and black jurors. He cites several examples in support of this contention.
“While disparate treatment is strong evidence of-discriminatory intent, it is not necessarily dispositive of discriminatory treatment. Lynch [v. State ], 877 So.2d [1254] at 1274 [ (Miss.2004) ] (citing Berry v. State, 802 So.2d 1038, 1039 (Miss.2001)); see also Chamberlin v. State, 55 So.3d 1046, 1050-51 (Miss.2011). “Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual.’ Lynch, 877 So.2d at 1274 (quoting Berry [v. State], 802 So.2d [1033] at 1040 [(Miss.2001) ]).”
Hughes v. State, 90 So.3d 613, 626 (Miss.2012).
“ ‘As recently noted by the Court of Criminal Appeals, “disparate treatment” cannot automatically be imputed in every situation where one of the State’s bases for striking a venireper-son would technically apply to another venireperson whom the State found acceptable. Cantu v. State, 842 S.W.2d 667, 689 (Tex.Crim.App.1992). The State’s use of its peremptory challenges is not subject to rigid quantification. Id. Potential jurors may possess the same objectionable characteristics, yet in varying degrees. Id. The fact that jurors remaining on the panel possess one of more of the same characteristics as a juror that was stricken, does not establish disparate treatment.’
“Barnes v. State, 855 S.W.2d 173, 174 (Tex.App.1993).
“‘[W]e must also look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury. See Miller-El [v. Dretke ], 545 U.S. [231] at 247, 125 S.Ct. [2317] at 2329 [162 L.Ed.2d 196 (2005) ].’
“Leadon v. State, 332 S.W.3d 600, 612 (Tex.App.2010).
“‘Potential jurors may possess the same objectionable characteristics, but in varying degrees. Additionally, prospective jurors may share a negative feature, but that feature may be outweighed by characteristics that are favorable from the State’s perspective. Such distinctions may properly cause the State to challenge one potential juror and not another.’
“Johnson v. State, 959 S.W.2d 284, 292 (Tex.App.1997). ‘This Court has recognized that for disparate treatment to exist, the persons being compared must be “otherwise similarly situated.” ’ Sharp v. State, 151 So.3d 308, 342 (Ala.Crim.App.2013) (on rehearing).
“‘The prosecutor’s failure to strike similarly situated jurors is not pretex-tual ... “where there are relevant differences between the struck jurors and the comparator jurors.” United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001). The prosecutor’s explanation “does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.” Rice v. Collins, 546 U.S. 333, 338, 126 *192 S.Ct. 969, 973-74, 163 L.Ed.2d 824 (2006) (quotation marks and citation omitted).’
“Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir.2009).”
Wiggins v. State, 193 So.3d 765, 790 (Ala.Crim.App.2014).
Luong asserts that a female prospective juror gave the same answers as did male jurors to questions concerning the death penalty, 'but, he says, the female juror was struck and the male jurors were not.[4] A review of the record shows that female prospective juror A.B.[5] was most likely struck because she indicated on her questionnaire that her son was a “habitual offender.” Male jurors A.F., R.F., and J.C. stated on their questionnaire that they had no relatives or close friends with convictions. • These jurors do not appear to be similarly situated.
Luong further argues that the State struck female prospective jurors who had family members who had been convicted of crimes but did not strike similarly situated male prospective jurors and that the struck female jurors all said that the fact that they had relatives with convictions would have no impact on their ability to be impartial. Luong identifies five prospective female jurors — D.W., C.K., E.Q., S.B., and N.S. — to support this argument. A review of the. record shows that two of these jurors — 'E.Q. and S.B. — were asked no questions concerning whether their relatives’s convictions would impact their impartiality. (R, 468-502.) Also, jurors C.K. and N.S. indicated during voir dire examination that they had reservations about the death penalty. (R. 787; 807.) N.S. said that she believed that only God should sentence anyone to death. (R. 807.) The last identified female juror, D.W., the State’s 45th strike,, served as an alternate. The challenged female prospective jurors were not similarly situated to the male jurors who were not struck.
Luong further argues that female prospective juror F.W. gave a similar answer to male juror A.F. concerning positive experience with police but that F.W. was struck by the State and A.F. was not. However, a review of the juror questionnaires does not support Luong’s assertion. Juror F.W. checked the box indicating that she had had a positive or negative experience with police and wrote: “Positive, tickets.” (First Suppl. C. 438.) Juror A.F. checked the box indicating that he had had a positive or negative experience with police but wrote: “Traffic ticket long time ago.” A.F. never indicated that he had had a negative or positive experience with police. These jurors were not similarly situated. .
In regard to the striking of white jurors and black jurors Luong argues that black prospective jurors were struck who had similar views on the death penalty as white jurors who were not struck, ' In a footnote in his brief, he merely cites page numbers in the supplemental record that correspond to juror questionnaires of black prospective jurors E.Q., S.B., M.A., G.S., L.T., C.W., and C.G. However, juror E.Q. indicated that she had two cousins who had been convicted of attempted murder, juror S.B. said that her brother had been convicted of a drug offense and had been in prison, juror M.A. said that her son was a “habitual offender,” juror G.S. indicated that he was sympathetic to individuals who *193 had alcohol problems and that those people needed help, juror L.T. said that she was a medical-social worker and that it was her job to perform psychological assessments on people, juror C.W. said that her brother had been convicted of attempted murder, and juror C.G. said that she had a friend who had been convicted of a controlled-substance crime. A review of the challenged jurors shows that they were not similarly situated to white jurors who were not struck based on their views regarding the death penalty.
We have thoroughly reviewed the voir dire examination and the‘juror questionnaires. The voir dire examination of the prospective jurors comprised over 500 pages of the record. Each juror also completed an 11-page juror questionnaire. The record shows that the prosecutor used its first 19 strikes to remove jurors in the order in which their names appeared on the strike list. Of the State’s first 10 strikes, 9 were used to remove individuals who had family members or close Mends with prior criminal convictions or had relatives currently in prison. The remaining juror indicated that she had reservations about the death penalty. Here, the record does not raise an inference that any form of discrimination was present in the juror-selection process. There is no plain error in regard to this Batson claim. Accordingly, Luong is due no relief on this claim.
IV.
Luong next argues that the circuit court erred in failing to sua sponte empanel a separate jury to determine whether he was competent to stand trial. He relies on the case of Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), to support this argument.
The record shows that, before trial, Luong moved for funds to secure the services of a psychiatrist, Dr. Paul K. Leung, to conduct a mental evaluation of Luong’s mental condition at the time of the offense and to determine-whether Luong was competent to stand trial. (C. 85.) The circuit court granted this motion. The State also moved that Luong be evaluated by Dr. Doug McKeown, a former clinical and forensic psychologist with the Alabama Department of Mental Health, to determine Luong’s mental condition at the time of the offense and whether he was competent to stand trial. (C. 206.) The circuit court granted this motion. Dr. Leung examined Luong on three occasions and found that Luong was competent to stand .trial. (R. 367.) It was also Dr. McKeown’s opinion that Luong was competent, to stand trial. (C. 215.) Luong did not move for a formal competency hearing — this claim was never presented to the circuit court. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.[6]
The record shows that before trial the following occurred:
“The Court: I want the defense lawyers to explain for the record how many mental health psychologists or psychiatrists *194 or mental health providers have examined [Luong] and what their diagnosis or opinions were.
“[Defense counsel]: Judge, he has been examined on, I believe, four occasions by Dr. Paul Leung, who is a psychiatrist in Portland, Oregon. Dr. Leung is an Asian who specializes in the treatment and diagnosis of Asian refugees for post-traumatic stress and that type of thing.
“Dr. Leung was brought in this case for two reasons: One, to examine [Luong’s] competence to stand trial and his mental state at the time of the offense. He was also retained for the purpose of mitigation. As part of those efforts, he examined Mr. Luong three times.
“We brought him back on a fourth occasion when Mr. Luong was talking about pleading guilty and wanting a death sentence. We brought him back for the purpose at that time to evaluate Mr. Luong to see if he was mentally competent to enter such a plea and understood the consequences of that plea if the Court followed his wish to both plead guilty and to accept a death sentence.
“He has indicated to us in a meeting with [cocounsel] and myself following that fourth evaluation, that Mr. Luong was, in fact, competent to enter such a plea and to accept a death sentence if that was the Court’s decision.
[[Image here]]
“And Doug McKeown also examined him too by the State.
“The Court: I understand the State has had an expert also. [Prosecutor], what did the State psychiatrist say?
“[Prosecutor]: The State.psychiatrist said that he was fully capable of understanding the nature and quality or wrongfulness of his actions; that he was not impaired in any fashion at the time of these events or now; and that he was perfectly capable of understanding the role of the judge, the jury, the defense attorneys, the prosecutions, and all court procedures.”
(R. 366-69.) The circuit court later made the following observation for the record: “I have observed Mr. Luong, and he does not appear to be in any particular distress or confused, and I find that what he has been doing here today is competent, he understands fully.” (R. 376.)
The United States Supreme Court in Pate v. Robinson held that a trial court must conduct a competency hearing when it has a “reasonable doubt” concerning the defendant’s competency to stand trial. That Pate holding is incorporated into § 15-16-22, Ala.Code 1975. That section reads, in pertinent part:
“(a) Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, that there is reasonable ground to believe that smh defendant may presently lack the capacity to proceed or continue to trial, as defined in Section 22-52-30, or whenever said judge receives notice that the defense of said defendant may proceed on the basis of mental disease or defect as a defense to criminal responsibility; it shall be the duty of the presiding judge to forthwith order that such defendant be committed to the Department of Mental Health and Mental Retardation for examination by one or more mental health professionals appointed by the Commissioner of the Department of Mental Health and Mental Retardation.”
(Emphasis added.)
Rule 11.1, Ala. R.Crim. P., defines “mentally incompetent” as “lacking] sufficient present ability to assist in his or her de *195 fense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.”
Rule 11.6, Ala. R.Crim. P., provides:
“(a) Preliminary Review. After the examinations have been completed and the reports have been submitted to the circuit court, the judge shall review the reports of the psychologists or psychiatrists and, if reasonable grounds exist to doubt the defendant’s mental competency, the judge shall set a hearing not more than forty-two (42) days after the date the judge received the report or, where the judge has received more than one report, not more than forty-two (42) days after the date the judge received the last report, to determine if the defendant is incompetent to stand trial, as the term ‘incompetent’ is defined in Rule 11.1. At this hearing all parties shall be prepared to address the issue of competency.”
(Emphasis added.)
The trial court has been described as the initial “screening agent” for mental-health issues:
“[Section 15-16-21, Ala.Code 1975] places the initial burden on the trial court to determine whether there are ‘reasonable grounds’ to doubt the accused’s sanity. ‘The trial court is, thus, the “screening agent” for mental examination requests.’ Reese v. State, 549 So.2d 148, 150 (Ala.Cr.App.1989). ‘“It is left to the discretion of the trial court as to whether there is a reasonable or bona fide doubt as to sanity, and, thus, whether a further examination is required.”’ 549 So.2d at 150. The trial court makes a preliminary determination ‘without the aid of a jury as to whether reasonable grounds existed to doubt the defendant’s competency.’ Rule 11.3, A.R.Crim. P., Committee Comments.”
Daniels v. State, 621 So.2d 335, 337 (Ala.Crim.App.1992).
“Competency to stand trial is a factual determination.” United States v. Boigegrain, 155 F.3d 1181, 1189 (10th Cir.1998). “There are of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.” Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). “In making a determination of competency, the .... court may rely on a number of factors,- including medical opinion and the court’s observation of the defendant’s comportment.” United States v. Nichols, 56 F.3d 403, 411 (2d Cir.1995). “Comments of defense counsel concerning an accused’s competency to stand trial are not conclusive; however, they should be considered by the court.” Williams v. State, 386 So.2d 506, 510-11 (Ala.Crim.App.1980). “Given that ‘a defendant’s behavior and demeanor at trial are relevant as to the ultimate decision of competency,’ we stress that the observations and conclusions of the district court observing that behavior and demeanor are crucial , to any proper evaluation of a cold appellate record.” United States v. Cornejo-Sandoval, 564 F.3d 1225, 1234 (10th Cir.2009). “[O]ne factor a court must consider when determining if there is reasonable cause to hold a competency hearing is a medical opinion regarding a defendant’s competence.” United States v. Jones, 336 F.3d 245, 257 (3d Cir.2003).
“We have said that ‘[i]t is the burden of a defendant who seeks a pretrial competency hearing to show that a reasonable or bona fide doubt as to his competency exists.’ Woodall v. State, 730 *196 So.2d 627, 647 (Ala.Cr.App.1997), aff'd in relevant part, 730 So.2d 652 (Ala.1998). ‘ “The determination of whether a reasonable doubt of sanity exists is a matter within the sound discretion of the trial court and may be raised on appeal .only upon a showing of an abuse of discretion.” ’ Id.; see also Tankersley v. State, 724 So.2d 557, 564 (Ala.Cr.App.1998).”
Freeman v. State, 776 So.2d 160, 172 (Ala.Crim.App.1999).
Here, the circuit court had the findings of two mental-health experts, both of whom agreed that Luong was competent to stand trial. “Absent a change in the appellant’s mental condition subsequent to a determination of competency by Bryce Hospital authorities the trial judge has a right to rely upon the certification by the Bryce Hospital authorities.” Williams, 386 So.2d at 511. Luong’s attorneys also indicated that Luong’s expert found that he was competent to stand trial and that they had no reason to question that expert’s finding. The circuit court also stated for the record that Luong appeared competent and appeared to “understand fully” what was happening. The circuit court committed no error in failing to sua sponte empanel a jury to conduct a competency hearing on Luong’s competency to stand trial. We find no error — much less plain error — in regard to this claim. Luong is due no relief on this claim.
V.
Luong next argues that the circuit court committed reversible error in allowing Cpt. Darryl Wilson of the Bayou La Batre Police Department to explain one of Luong’s statements to him. Specifically, he argues that his testimony violated Rule 701, Ala. R. Evid., because, he says, a witness may not testify to the uncommuni-cated mental operation of another.[7]
The following occurred during Cpt. Wilson’s testimony:
“[Prosecutor]: And so, having that familiarity with the culture and shall we say the dialect and accent, when you asked [Luong] how come you didn’t jump off the bridge with them after you threw them over, he said I wanted to see what my wife and family looked like. Okay. That’s not saying ‘the look on her face,’ but ‘looked like,’ Okay. Is that a phraseology that would be something you have heard before, or how you would — why you would interpret it that way?
“[Cpt. Wilson]: I interpret it based on—
“[Defense counsel]: Judge, I object. It calls for. a mental operation of the witness. The statement speaks for itself.
“The Court: You opened it up, [defense counsel]. Go ahead.
“[Cpt. Wilson]: I based it off my criminal experience in investigations, that he wanted to see the look on his wife’s face. The same as when — back in the docket room, when, he said ‘I’ll’ and he stopped. And at that point, based off my experience investigating the Vietnamese, I knew that he wanted to be the one to tell her.
“[Prosecutor]: And then you said' — so you clarify, I wanted to — You wanted to watch your wife’s face after you told her that you had killed them.’ He. said: ‘Uh-huh.’ ”
(R. 1177-78.)
The State argues, in it brief to this Court, that Cpt. Wilson was “simply de *197 scribing his conversation with Luong and his perception of Luong’s statement which led him to then ask Luong another question to clarify Luong’s meaning.” (State’s brief, p. 72.) We agree. The prosecutor did not ask Cpt. Wilson any question that elicited any mental ■ operation but merely asked why he clarified- Luong’s statement. There was no error in Cpt. Wilson’s testimony.
Moreover, Rule 45, Ala. R.App. P., states;
“No judgment may be reversed or set aside ... on ground of misdirection of the jury ... -unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
The harmless-error rule has been applied in death-penalty cases. . See Ex parte Brownfield, 44 So.3d 43 (Ala.2009); Ex parte Stephens, 982 So.2d 1148 (Ala.2006); Ex parte Whisenhant, 482 So.2d 1247 (Ala.1984); Wilson v. State, 142 So.3d 732 (Ala.Crim.App.2010); Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010); Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008).
Thus, even if error did occur, and we conclude that it did not, the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
“In [Ex parte] Wilson, [571 So.2d 1251 (Ala.1990),] this Court, quoting Chapman [v. California], 386 U.S. [18] at 24, 87 S.Ct. [824] at 828 [ (1967) ], stated that ‘“before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.” ’ 571 So.2d at 1264. Applying that rule of law to the facts of this case, we conclude, as did the Court of Criminal Appeals, that the record shows that the evidence of guilt is ‘virtually ironclad’; therefore, we agree with the Court of Criminal Appeals that [the error] did not affect the outcome-of the trial or otherwise prejudice [the appellant’s] right to a fair trial.”
Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993).
For these reasons, we find no reversible error in regard to this claim, and Luong is due no relief.
VI.
Luong next argues that the circuit court violated his constitutional rights jay allowing jurors who had been exposed to media coverage indicating that Luong initially wished to plead guilty and then changed his mind to serve on the jury.
“The constitutional standard of juror impartiality does not require that jurors be wholly ignorant of the facts and issues involved in the case. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Thus, exposure does not impair the defendant’s right to an impartial jury if the jurors can lay aside any impressions or opinions that result from pretrial media exposure and render a verdict based solely on the evidence presented during the trial. Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).”
Tucker v. State, 429 So.2d 1165, 1170 (Ala.Crim.App.1983).
On certiorari review, the Aabama Supreme Court held that the voir dire in Luong’s case was sufficient to uncover any biases that the prospective jurors had toward Luong concerning the media coverage surrounding the case. See Luong II. *198 Accordingly, Luong is due no relief on this claim.
VII.
Luong next argues that the circuit court’s jury instructions during the guilt phase were erroneous and violated his constitutional rights.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘“the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992);, Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999). “[W]e must view [the jury instructions] as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
“Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.”
Boyde v. California, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
Here, at the conclusion of the jury instructions in the penalty phase the following occurred:
“The Court: Any exceptions from the State?
“[Prosecutor]: No, sir.
“The Court: Any from the defense?
“[Defense counsel]: Judge, we have no objection as to the charges.”
(R. 1489.) Luong did not object to any of the now challenged jury instructions; therefore, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
“‘In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” ’
“Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996). ‘The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.’ Ex parte Boyd, 715 So.2d 852, 855 (Ala.1998).”
Thompson v. State, 153 So.3d 84, 152 (Ala.Crim.App.2012).
With there principles in mind, we review the challenged jury instructions.
A.
First, Luong argues that the circuit court’s instructions on intoxication were contrary to the law set out in § 13A-3-2, Ala.Code 1975. Specifically, Luong argues that the circuit court erroneously instructed the jury that to find that Luong’s intoxication negated his specific intent to kill the jury had to find that Luong lacked the capacity to appreciate the criminality of his *199 conduct or that he was intoxicated to the point of insanity. He asserts that this “insanity standard” applies only to “involuntary intoxication” and not “voluntary intoxication.” His argument appears to imply that the degree of proof necessary to prove voluntary intoxication is less that the degree of proof necessary to prove involuntary intoxication.
Section 13A-3-2, Ala.Code 1975, provides:
“(a) Intoxication is not a defense to a criminal charge, except as provided in subsection (c) of this section. However, intoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged.
[[Image here]]
“(c) Involuntary intoxication is a defense to prosecution if as a result the actor lacks capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
“(d) Intoxication in itself does not constitute mental disease or defect within the meaning of Section 13A-3-1.”
Here, the circuit court gave the following instruction on intoxication:
“[TJhere has been evidence in this case that Lam Luong may have been under the influence of drugs. Since intoxication has been injected into this case, what I will tell you about intoxication is not limited to the use of alcohol. It applies with equal force to the use of illegal drugs such as crack cocaine or the intentional misuse of prescription drugs. It’s up to you to determine whether Lam Luong was intoxicated at all, or whether he was highly intoxicated. But in order for intoxication to reduce what would otherwise be capital murder to manslaughter, he has got to be so intoxicated that, in effect, he doesn’t know what he is doing. So intoxicated that he can’t form an intent. So intoxicated specifically, that he can’t form an intent to kill.
“I charge you, members of the jury, that voluntary intoxication means intoxication caused by substances that the actor, in this case Lam Luong, knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know.
“While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to capital murder and reduce it to manslaughter.
“I charge you, members of the jury, that where, as in this ease, Lam Luong is charged with a crime requiring specific intent and there may be evidence of [Luong’s] intoxication affecting the mental state and condition of the accused, [Luong’s] possible intoxication is a proper subject to be considered by you in deciding the question of [Luong’s] intent.
“In determining whether Lam Luong was intoxicated at the time of the alleged offenses, you have to look at all of the circumstantial evidence. What did he do at that point in time? What was he capable of doing? Was he capable of forming an intent to do other things and carry out those purposes?
“You look at the entirety of the circumstances surrounding the event in question and make your determination from the entirety of the circumstances as to whether Lam Luong was so devoid of judgment, because of either alcohol of other substances, that he couldn’t form an intent.
“If you find from the evidence that Lam Luong was sufficiently intoxicated that he could not form a specific intent, *200 an essential element of capital murder, you cannot find [Luong], Lam Luong, guilty of capital murder. You may, however, find [Luong] guilty of committing manslaughter against the three — four children.
“I charge you that the intoxication must be so excessive as to paralyze his mental faculties and render him incapable of forming or entertaining the design to take a life. In other words, in order for his intoxication to have the effect of negating intent, Lam Luong has to be so intoxicated that he literally did not know what he was doing and could not form a purpose to do specific things.”
(R. 1460-62.)
The Alabama Supreme Court has recognized that “ ‘the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity.’” Ex parte McWhorter, 781 So.2d 330, 342-43 (Ala.2000), quoting Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991).
“The Alabama Supreme Court discussed the degree of intoxication necessary to negate criminal intent in Ex parte Bankhead, 585 So.2d 112 (Ala.1991), on remand to, 585 So.2d 133 (Ala.Crim.App.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). The Alabama Supreme Court stated:
“ ‘In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App.1986) ]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant’s intoxication rendered it impossible for the defendant to form a particular mental state.’
“585 So.2d at 121.”
Saunders v. State, 10 So.3d 53, 99 (Ala.Crim.App.2007).
This Court has repeatedly upheld jury instructions on intoxication that charge the jury that the degree of intoxication necessary to negate the “specific intent” to kill must amount to insanity. See Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011); Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010); Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999); Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996); Wesson v. State, 644 So.2d 1302 (Ala.Crim.App.1994).
The circuit court’s instructions on intoxication were thorough and consistent with Alabama law. The instructions did not constitute error — much less plain error. Luong is due no relief on this claim.
B.
Luong next argues that the circuit court erred in its jury instruction on witness credibility. Specifically, he asserts that the circuit court’s instructions reduced the State’s burden of proof by “conditioning *201 the jury’s right to disbelieve uncontradict-ed testimony” and that the instruction “interfered with the [juror’s] common sense factfinding process.” (Luong’s brief, p. 99.)
The circuit court gave the following instruction:
“It is your duty to attempt to reconcile the testimony of all witnesses so as to make them all speak the truth if this can be reasonably done. If you cannot reasonably reconcile all of the testimony, then it’s your duty to consider the testimony with a view of determining what the truth is.
“In considering the testimony of'witnesses, I charge you and remind you that you are thé sole judges of the evidence as well as the credibility of those witnesses. You may accept any part of the testimony you consider to be worthy of belief, and reject that which isn’t.
“In determining the weight to be accorded to the testimony of any witness, you may consider the witness’s demean- or while they are on the witness stand, his or her apparent candor or evasiveness, or the existence or nonexistence of any bias or interest that that particular witness may have to this case.
“You may take into consideration any matter which you would in your everyday affairs in passing upon the truthfulness and accuracy- of the testimony. Weigh the testimony in light of your common-observations and everyday experiences of a lifetime, and reach a verdict that will be based upon the truth as you determine it from all of the ■ evidence.
“Now, all of the witnesses who took this witness stand were sworn to tell the truth. However, in the event that you determine that any witness has intentionally and willfully sworn falsely to a material fact, then you may disregard that witness’s testimony in its entirety. The theory of the law in this state is this: That if a witness, while under oath, intentionally-and willfully swears falsely to a fact which is material to this case, then you can disregard that witness’s testimony in its entirety because the law — the theory of the law is that if a witness will do that with one material fact, they might certainly do it to all matérial facts. However, I will tell you that that is willfully testifying falsely to ■a fact which is material to this case.
“Now, that doesn’t apply in cases where a witness is -confused, or his or her memory might be a little vague because of a lapse of timé; but only where you feel that under oath he or she willfully, falsely testified to a fact which is material.
“Now, if you find a conflict in the evidence, you may look to the witness’s means of knowledge and opportunities of that witness for .observing and knowing the facts that they testified about in determining where you find the truth.”
(R. 1453-55.)
“Here, the trial court’s instruction informed the-jury that it should evaluate the credibility of all the evidence and witnesses in determining the facts and in reaching its decision. The instruction properly summarized the jury’s role as the sole fact-finder in the case.” See Centobie v. State, 861 So.2d 1111, 1139 (Ala.Crim.App.2001). We have affirmed judgments based on verdicts following similar jury instructions in Broadnax v. State, 825 So.2d at 197 and cases cited therein. The circuit court’s instructions on witness credibility did not constitute error, much less plain error. Luong is due no relief on this claim.
C.
Luong next argues that the circuit court’s instructions on reasonable doubt *202 reduced the State’s burden of proof in violation of the United States Supreme Court’s decision in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
In discussing the Supreme Court’s holding in Cage v. Louisiana, this Court has stated:
“The United States Supreme Court in Cage v. Louisiana [, 498 U.S. 39 (1990),] held that use of the terms ‘grave uncertainty, actual substantial doubt, and moral certainty[1] to define reasonable doubt could be interpreted ‘to allow a finding of guilt based, on a degree of proof below that required by the Due Process Clause.’ 498 U.S. at 41. Cf. Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (use of the phrase ‘moral certainty in the court’s instruction did not lower the State’s burden of proof).”
Thompson, 153 So.3d at 153-54.
Specifically, Luong challenges the following poi'tion of the circuit court’s reasonable-doubt instruction:
“I think another way of saying this is: If after considering all of the evidence in this case, you ask yourself the question: ‘Is Lam Luong guilty?;’ and if the answer that freely and naturally flows back to you is T doubt that he is’ and if that doubt is based on evidence that has come before you or the lack of it, then the law says that that’s the kind of doubt that would entitled a person to a finding of not guilty.”
(R. 1464-65) (emphasis added). Luong argues in brief: “The Constitution does not permit a finding of reasonable doubt to be limited to those doubts that ‘freely and naturally flow back’ to jurors.” (Luong’s brief, p. 101.)
The challenged instruction occurred at the conclusion of a very lengthy instruction on reasonable doubt. “In reviewing the reasonable doubt instruction in this case, we do so in the context of the charge as a whole.” Bush v. State, 695 So.2d 70, 115 (Ala.Crim.App.1995). The circuit court’s entire instruction on reasonable doubt read:
“The phrase ‘beyond a reasonable doubt’ is somewhat a subjective term. Most people know intuitively what the law means when it says that the State has to prove the guilt of [Luong] beyond a reasonable doubt.
“A reasonable doubt may arise from all of the evidence, from any part of the evidence, from a lack of the evidence, or from a cross-examination of the witnesses. A reasonable doubt, however, is not an imaginary doubt. It’s not a vague or fanciful doubt as the law sometimes describes it, it’s not a guess, it is not surmise. Rather, it is a doubt for which a reason can be given arising from a fair and impartial consideration of all of the evidence and the just and reasonable inferences that arise therefrom.
“Proof beyond a reasonable doubt is proof of such convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own personal affairs.
“If you can say you have an abiding conviction of the guilt of Lam Luong beyond a reasonable doubt, then it is your duty to find him guilty. If you cannot say that, then you are not convinced beyond a reasonable doubt, and it would be your duty to find him not guilty.”
(R. 1465-66.)
This instruction was similar to the pattern jury instruction on reasonable doubt.
“A substantial portion of the guilt-phase and sentencing-phase jury charge on reasonable doubt tracked the language of the pattern jury instruction.... The *203 phrases regarding a determination regarding reasonable doubt that ‘naturally flowed’ to the juror, to which [the appellant] now objects, were similar to the phrases in the pattern charge regarding a fair-minded juror using reason and common sense. Furthermore, the trial court repeatedly instructed the jury that its decision had to be based on evidence.”
Hosch v. State, 155 So.3d 1048, 1105 (Ala.Crim.App.2013). See also Mack v. State, 607 So.2d 314 (Ala.Crim.App.1992); Barnes v. State, 565 So.2d 1274 (Ala.Crim.App.1990); Johnson v. State, 541 So.2d 1112 (Ala.Crim.App.1989); Thompson v. State, 401 So.2d 285 (Ala.Crim.App.1981).
“A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997).[8] This Court has specifically held that use of the pattern jury instruction on reasonable doubt did not constitute plain error. See Whatley v. State, 146 So.3d 437, 478 (Ala.Crim.App.2010); Smith v. State, 795 So.2d 788, 831 (Ala.Crim.App.2000).
The circuit court’s jury instructions did not constitute error — much less plain error. Luong is due no relief on this claim.
D.
Luong next argues that the circuit court’s instructions on circumstantial evidence were erroneous because, he says, they were incomplete. Specifically, he argues that the circuit court failed to instruct the jury that circumstantial evidence is entitled to the same weight as direct evidence “when it points to the defendant’s innocence” and that circumstantial evidence may be sufficient to establish a reasonable doubt. (Luong’s brief, p. 102.)
The circuit court gave the following instruction on circumstantial evidence:
“Ladies and gentlemen, certain of the elements of the offenses in this case may rest upon circumstantial evidence. It is permissible for the State to prove its case by circumstantial evidence, frankly, in its entirety.
“Circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Circumstantial evidence alone may be sufficient to prove Lam Luong’s commission of or participation in the crime as long as it is so cogent as to exclude every reasonable hypothesis except that of his guilt. However, there should not be a conviction on circumstantial evidence unless it does exclude every reasonable hypothesis other than the guilt of Lam Luong.
“No matter how strong the circumstances, if those circumstances can be reasonably reconciled with the theory that [Luong] is innocent, then the guilt of the accused is not shown by that full measure of proof that the law requires, and [Luong] should be acquitted.
“The difference between circumstantial evidence and direct evidence is simply that direct evidence usually means eyewitness testimony, where one person sees another person do a particular thing.
“Circumstantial evidence is the kind of evidence from which you can infer other facts.
“In considering the evidence in this case, you may make deductions and reach conclusions which reason and common sense lead you to make, and you *204 should not be concerned about whether the evidence is either direct or circumstantial. The law, again, makes no distinction between the weight you should give either direct or circumstantial evidence.”
(R. 1456-58.)[9]
This instruction given here is similar to the pattern jury instruction on circumstantial evidence.
“The circumstantial-evidence instruction given by the trial court is substantially similar to the instruction in the Alabama Pattern' Jury Instructions: Criminal on this concept. Also, the Supreme Court has sated, ‘ “Circumstantial evidence is sufficient when it is so strong and cogent as to indicate the guilt of the defendant to a moral certainty. That evidence should also exclude any inference consistent with the defendant’s innocence.” ’ Ex parte Mitchell, 723 So.2d 14 (Ala.1998), quoting Ex parte Davis, 548 So.2d 1041, 1044 (Ala.1989).”
Woods v. State, 789 So.2d 896, 933 (Ala.Crim.App.1999).
The circuit court’s instructions on circumstantial evidence did not constitute error — much less plain error. Luong is due no relief on this claim.
E.
Luong next argues that the circuit court’s instructions on intent were erroneous. Specifically, he argues that the instruction violated § 13A-6-2(a)(l), Ala. Code 1975,[10] because, he says, “[T]he State has the burden of proving beyond a reasonable doubt that the defendant intended to cause the death of another person, -not merely that the defendant intended the actions that caused the death of another person.” (Ling's brief, p. 103.)
The circuit court gave the following instruction on intent:
“I charge you, members of the jury, that a person acts intentionally with respect to a .result or to conduct described by a statute defining an offense when his purpose is to cause that result or engage in that conduct. Now, that’s the legal definition of intent. And the definition is to be used for all five counts. •
“I have always felt that the definition could be a little bit difficult to understand, frankly. And so maybe in layman’s terms it would be easier for us to understand it if we simply said: Did a person mean to do it? That’s what we’re talking about. Is this something that Lam Luong meant to do? And, of course, you can consider what a person actually does as being a circumstance bearing on what he intended to do. You have to look at all of the circumstances to determine whether or not there was intent to do a particular thing at a particular point in time. Intent is generally a matter that has to be determined by circumstantial evidence.”
(R. 1459-60.) When the circuit court instructed the jury on the counts charged in the indictment, the court specifically instructed the jury that it had to find that the defendant had the .intent to kill each *205 person named in the indictment and that “[t]he intent to kill must be real and specific.” (R. 1469.)
“Alabama appellate courts have repeatedly held that, to be convicted' of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. E.g., Gamble v. State, 791 So.2d 409, 444 (Ala.Crim.App.2000); Flowers v. State, 799 So.2d 966, 984 (Ala.Crim.App.1999); Duncan. v. State, 827 So.2d 838, 848 (Ala.Crim.App.1999).”
Ziegler v. State, 886 So.2d 127, 140 (Ala.Crim.App.2003).
The jury was properly instructed that to convict Luong of capital murder the jury had to find that he had the specific intent to kill — not merely the intent to commit a specific act. See Ziegler. There was no error, much less plain error in the circuit court’s instructions on intent. Luong is due no relief on this claim.
VIII.
Luong argues that the circuit judge should have sua sponte recused himself from presiding over Luong’s case because, he says, he could not fairly consider a sentence of life imprisonment without the possibility of parole. To support this argument Luong cites a comment the circuit judge made during voir dire examination and points to adverse rulings the circuit court made during the course of Luong’s trial.
Luong did not raise this issue in the lower court proceedings. Therefore, we review this claim for plain error. See Rule 45A, Ala RApp. P.
The records shows that the following occurred during the voir dire examination of prospective juror T.S.:
“[Defense counsel]: You had candidly, and we appreciate your candor, admitted that at some point you had made a statement to the effect that death should be the sentence in this case. Is that— Did I understand that correctly?
“[T.S.]: That is correct.
“[Defense counsel]: And can you tell us a little bit about the circumstances under which you made that statement?
“[T.S.]: Well, I did take the oath and I will — am not going to stand here and lie. That I have four children and I made the statement that if the man is guilty, his hands should be tied and he should be thrown off the bridge.
[[Image here]]
“The Court: All right. Okay. Thank you. I appreciate your candidness, Mr. [T.S.]. I’m going to excuse you from service on this jury. And your being down here has meant a great deal to all of us, and we — some of us probably can appreciate what you are thinking.”
(R. 864-65.)
All judges are presumed to be impartial and unbiased. Cotton v. Brown, 638 So.2d 870 (Ala.1994). The burden is on the party seeking recusal to prove otherwise. Ex parte Melof, 553 So.2d 554, 557 (Ala.1989). Canon 3.C.(1), Alabama Canons of Judicial Ethics, governs when a trial judge is required to recuse himself or herself from presiding over a case. The Canon states, in pertinent part:
“(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
“(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding,...”
*206 “The question is not whether the judge was impartial in fact, but whether another person, knowing all of the circumstances, might reasonably question the judge’s impartiality — whether there is an appearance of impropriety.” Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.1994).
“ ‘The burden is on the party seeking recusal to present evidence establishing the existence of bias or prejudice. Otwell v. Bryant, 497 So.2d 111, 119 (Ala.1986). Prejudice on the part of a judge is not presumed. Hartman v. Board of Trustees, 436 So.2d 837 (Ala.1983); Duncan v. Sherrill, 341 So.2d 946 (Ala.1977); Ex parte Rives, 511 So.2d 514, 517 (Ala.Civ.App.1986). “ ‘[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.’” Ex parte Balogun, 516 So.2d 606, 609 (Ala.1987), quoting Fulton v. Longshore, 156 Ala. 611, 46 So. 989 (1908). Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source. Hartman v. Board of Trustees of the University of Alabama, 436 So.2d 837 (Ala.1983); Reach v. Reach, 378 So.2d 1115 (Ala.Civ.App.1979). Thus,
“ ‘ “ ‘[T]he disqualifying prejudice of a judge does not necessarily comprehend every bias, partiality, or prejudice which he may entertain with x-eference to the case, but must be of a character, calculated to impair seriously his impartiality and sway his judgement, and must be strong enough to overthrow the presumption of his integrity.’ ”
“ ‘Ross v. Luton, 456 So.2d [249] at 254 [ (Ala.1984) ], quoting Duncan v. Sherrill, 341 So.2d 946, 947 (Ala.1977), quoting 48 C.J.S. Judges § 82(b).’ ”
Hodges v. State, 856 So.2d 875, 898 (Ala.Crim.App.2001) (opinion on return to remand), quoting Ex parte Melof, 553 So.2d 554, 557 (Ala.1989). “Adverse rulings during the course of the proceedings are not by themselves sufficient to establish bias and prejudice.” Hartman v. Board of Trs. of Univ. of Alabama, 436 So.2d 837, 841 (Ala.1983).
“The trial judge is a human being, not an automaton or a robot. He is not required to be a Great Stone Face which shows no reaction to anything that happens in his courtroom. Testimony that is amusing may draw a smile or a laugh, shocking or distasteful evidence may cause a frown or scowl, without reversible error being committed thereby. We have not, and hopefully never will reach the stage in Alabama at which a stone-cold computer is draped in a black robe, set up behind the bench, and plugged in to begin service as Circuit Judge.”
Allen v. State, 290 Ala. 339, 342-43, 276 So.2d 583, 586 (1973).
“A trial judge ‘has a duty to maintain a calm demeanor, the decorum of the courtroom and avoid any action which might suggest partiality.... A judge, howevei*, is a human being, and not the type of unfeeling robot some would expect the judge to be. Such a display of exasperation ... falls far short of a reasonable cause for disqualification for bias or prejudice under [Rule 2.3] of the Code of Judicial Conduct.’ (Citation omitted; internal quotation marks omitted.) Barca v. Barca, supra, 15 Conn.App. [604] at 614, 546 A.2d 887 [ (1988) ].”
In re Messiah S., 138 Conn.App. 606, 628, 53 A.3d 224, 237 (2012).
The circuit judge’s remark to juror T.S. during voir dire showed that the circuit court empathized with T.S.’s views. We *207 do not agree that the circuit judge’s comment evidenced his dislike for Luong or his inability to follow the law in regard to sentencing Luong.
As further evidence of bias, Luong also asserts that the circuit judge showed his'bias by stating that he would limit the amount of money he would approve for counsel’s investigation into mitigation evidence and that the court refused to consider some of Ling’s offered evidence as mitigation. “[Jjudicial rulings alone almost never constitute a valid basis for a bias or partiality motion.” Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The bias necessary for a judge to recuse must stem from an “extrajudicial source.” See United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The record does not reflect any perceived bias that stemmed from any extrajudicial source.
There was no error in the circuit judge’s failure to sua sponte recuse himself from presiding over Luong’s case. Luong is due no relief on this claim.
IX.
Luong next argues that the circuit court erred in excusing an entire panel of 20 prospective jurors after they all indicated that they could not impose the death penalty.
The record shows that during voir dire examination the circuit court indicated that it intended to have returned to the courtroom the panel whose members all indicated that under no set of circumstances could they vote for the death- penalty. The circuit court stated that it would question the group to see if they continued to hold this view toward the death penalty. Defense counsel moved that he be allowed to question these jurors individually. The circuit court denied this motion. Defense counsel objected to the “en masse” excusal of this panel of jurors. (R. 738.) The following occurred:
“The Court: I have asked that you all come in here. When I questioned— when I was questioning the jury earlier about their views and positions on capital punishment or the death penalty, it’s my understanding that each one of you indicated to me that under no set of circumstances, no matter how heinous the offense may be, you could not impose the death penalty. So, out of an abundance of caution, so that I make sure that I didn’t misunderstand, or that ¡any of you have a different opinion than I took down, I’m going to ask you this question, and I want you to answer it for me.
“Is there any of you who, no matter what the evidence, no matter what the circumstances, would be absolutely unable to vote to impose the death penalty? In other words, under no circumstances would you vote to impose the déath penalty no matter how grievous or heinous the crime. Is that true? No matter what the law in this state is, you would be unable to impose the death penalty.”
(R. 741.) The circuit court then individually polled 19 of the jurors, and they indicated that they could not impose the death penalty under any circumstances. The 20th prospective jiiror asked if he could ask a follow-up question and the circuit court said: “Okay. I am going to let — at this time I am going to excuse all of you who just answered no.” (R. 743.) The 20th juror was questioned and was struck after he indicated that he could not impose the death penalty. (R. 745.)
“[M]uch must be left to the sound discretion of the trial court as to the nature, variety and extent of the questions *208 that should be asked prospective jurors by the parties, or their counsel, in the process of selecting the jury to try a case.” Ervin v. State, 399 So.2d 894, 897 (Ala.Crim.App.1981). “The Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury.” Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
The State of- North Carolina has held that a defendant has no right to rehabilitate a juror who has expressed reservations about the death penalty.
“The defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court. The reasoning behind this rule is clear. It prevents harassment of the prospective jurors based on their personal views toward the death penalty.”
State v. Cummings, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). See also Littlejohn v. State, 85 P.3d 287 (Okla.Crim.App.2004), quoting Williams v. State, 22 P.3d 702, 710 (Okla.Crim.App.2001) (“ ‘When the proper questions have been asked by the trial court to determine whether prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity tó rehabilitate the excused jurors.’ ”).
The record shows that the challenged jurors all indicated that they could not recommend the death penalty under any set of circumstances. The circuit court did not abuse its discretion in excusing these 20 jurors based on their views toward the death penalty. Accordingly, we find no reversible error in regard to this claim, and Luong is due no relief.
-X.
Luong next argues that the in-court identification of Luong by two State witnesses violated his constitutional rights because, he says, their pretrial identifications had been suggestive and unreliable. Specifically, he argues that the two witnesses had a limited amount of time to observe Luong and that both had seen his picture in the newspaper between the date of the murders and the time - that they identified him at trial.
The record shows that Jeff Coolidge testified that he was driving on the Dauphin Island Bridge on the morning of January 7, 2008, and he observed a parked van on the side of the road at the top of the bridge and a man at the “sliding door” of that van. He then testified that from a distance he saw what appeared to a bag go over the side of the bridge and that as he approached the van he rolled down his window and saw three small children in the back of the van. The following occurred:
“[Prosecutor]: And did you get a good look at the person who threw the object over the rail?
“[Coolidge]: At that point, yes, ma’am, I did. What he had done was he repositioned himself, like I said, to face the open door. Kept his head down a little bit. But I noticed that it was what appeared to me as an Asian individual. And I slowed up just, you know, maybe within ten, fifteen miles an hour, until I noticed the children. Then I gradually increased my speed and went over the bridge. And I got a good look at the individual.
“[Prosecutor]: At his face?”
(R. 1220.) Coolidge further testified that that night he went to the Bayou La Batre Police Department to report what he had seen. Coolidge identified Luong as a man he had seen on the top of the Dauphin Island Bridge on that January day in 2008. (R. 1223.) Luong did not object to Cool *209 idge’s in-court identification; therefore, we review this claim only for plain error. See Rule 45A, Ala. R.App. P.
Frank Collier testified that he crossed the Dauphin Island Bridge on the morning of January 7, 2008, as a passenger in a vehicle being driven by his cousin. He saw a van parked at the top of the bridge and a man straddling the concrete barrier with one leg over the side of the bridge. Collier testified that he got a good look at the man and that after he saw the news and the man’s picture on television he contacted the police. He identified Luong as the man on the top of the Dauphin Island Bridge on that January day. Luong did not object to Collier’s identification at trial; therefore, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
In its brief, the State relies on the holding in State v. Addison, 160 N.H. 792, 802, 8 A.3d 118, 126 (2010), and argues that, because there was no state action involved in the pretrial identifications made by witnesses Coolidge and Collier, both in-court identifications were admissible without consideration of their reliability.
“The majority of federal and state courts agree that an allegedly suggestive pre-trial identification must be the result of state action in order to affect the admissibility of a later in-court identification. See, e.g., United States v. Kimberlin, 805 F.2d 210, 233 (7th Cir.1986) (refusing to find a due process violation where a witness had not been shown a picture of the defendant by a government agent, but rather had seen it on television), cert. denied, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); United States v. Zeiler, 470 F.2d 717, 720 (3d Cir.1972) (refusing to find the identification suggestive and viola-tive of due process, reasoning that when ‘there is no evidence that law enforcement officials encouraged or assisted in impermissiv.e [sic] identification procedures, the proper means of testing eyewitness testimony is through cross-examination’); Green v. State, 279 Ga. 455, 614 S.E.2d 751, 754-55 (2005) (refusing to find the identification unduly suggestive and violative of due process because the State had no involvement in televising the defendant’s arrest); Com. v. Colon-Cruz, 408 Mass. 533, 562 N.E.2d 797, 805 (1990) (stating that the ‘crucial question’ in an allegedly suggestive identification procedure ‘is whether any possible mistake was the result of improper procedures on the part of the Commonwealth’); State v. Pailon, 590 A.2d 858, 863 (R.I.1991) (refusing to find a due process violation by an in-court identification of a witness after an allegedly suggestive identification absent state action); State v. Reid, 91 S.W.3d 247, 272-73 (Tenn.2002) (finding identification testimony properly admitted because there was no evidence of State involvement in the witness’s identifications of the defendant), cert. denied, 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003).
“The defendant does not allege any improper pre-trial state action affecting the in-court identification of the defendant. Without improper state action, the [Neil v.] Biggers [, 409 U.S. 188 (1972) ] test ‘does not apply to in-court identifications.’ [State v.] King, 156 N.H. [371] at 376, 934 A.2d 556 [ (2007) ] (quotation omitted). Instead, the proper remedy for ‘any alleged suggestiveness of an in-court identification is cross-examination and argument.’ Id. (quotation omitted). Here, the defendant had sufficient opportunity to cross-examine the identifying witnesses at trial.”
160 N.H. at 802, 8 A.3d at 126.
The United States Supreme Court in Perry v. New Hampshire, — U.S. —, *210 132 S.Ct. 716, 181 L.Ed.2d 694 (2012), held: “The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to. assess its creditworthiness.” 132 S.Ct. at 728. Because there was no state action in the pretrial identification procedures in this case, no finding of reliability under Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), was necessary in order for the in-court identifications to be admissible.
Moreover, in reviewing the reliability factors set out in Neil v. Biggers, we examine
“the opportunity of the witness to view the criminal at the time of the crime, the witness’ degree of attention, the accuracy of the witness’, prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.”
409 U.S. at 199-200. The testimony of both Coolidge and Collier was sufficient to satisfy the Neil v. Biggers factors.
Furthermore, the United States Supreme Court has recognized that the harmless-error doctrine under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applies to the erroneous admission of eyewitness testimony based on an unduly suggestive lineup. See Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). “Even if the in-court identification is found to be unreliable, any constitutional error is subject to harmless error analysis.” United States v. Jean, 315 Fed.Appx. 907, 912 (11th Cir.2009). Luong confessed to throwing his four children off a bridge, and he led police to the exact location. Luong’s defense at trial was that he was so intoxicated at the time of the murders that he could not form the specific intent to kill. Thus, even if error did occur in the two witnesses’ identification of Luong, any error was harmless beyond a reasonable doubt. Luong is due no relief on this claim.
XI.
Luong next argues that the circuit court erred in admitting photographs and a videotape because, he says, they were prejudicial and irrelevant. Specifically, Luong argues that the circuit court erred in allowing 15 autopsy photographs of the victims and a videotape of the recovery of Hannah’s body to be admitted into evidence. He specifically argues in brief: “[T]he parade of autopsy and recovery photographs, and-the video, depict gory, grotesque, and gruesome injuries that are completely irrelevant to these causes of death.” (Luong’s brief, at p. 143.)
“Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into *211 evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987), Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).”
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989).
“The history of the admission of autopsy photographs is extensive:
“ “With regard to photographs of the victim, ... even though they are cumulative and pertain to undisputed matters, generally photographs that depict the external wounds on the body of the victim are admissible. Bankhead [v. State ], 585 So.2d [97, 109 (Ala.Crim.App.1989) ]. As we held in Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1034 (Ala.1993), ‘[t]he state [has] the burden of proving that the victim [is] dead, and [photographs are] direct evidence on that point....’
“Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996) .... Moreover, autopsy photographs depicting the internal views of wounds are likewise admissible, In Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App.1987), we stated that even though autopsy photographs of a victim’s head injuries, as viewed internally,, may be gruesome, admission of such photos is sometimes necessary to demonstrate the extent of the victim’s injuries. See Dabbs, supra.”
Broadnax v. State, 825 So.2d 134, 159 (Ala.Crim.App.2000).
In regard to videotapes, we have stated: “[T]he videotape was admissible despite the appellant’s claim that it was highly inflammatory because it showed the decomposition of the .victim’s body. . The same rule applies for videotapes as-for photographs: ‘The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Ex parte Carpenter, 400 So.2d 427 (Ala.1981).’ Walker v. State, 416 So.2d 1083, 1090 (Ala.Cr.App.1982).”
Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989).
We have reviewed all the photographs and videotapes that were admitted at Luang’s trial and find no abuse of the circuit court’s considerable discretion in its admission of the photographs of the victims’ bodies and a videotape of the recovery of Hannah’s body. Luong is due no relief on this claim.
XII.
Luong next argues that the circuit court erred in discharging juror S.J. after juror S.J. informed the court that she had had an asthma attack and would be late for court on the morning closing arguments were scheduled to begin. Luong argues that the circuit court violated § 12-16-230, Ala.Code 1975, by removing this juror because, he says, her sickness was not. a sufficient reason to remove her from the case.
The record indicates that on the morning closing arguments were beginning juror S.J. telephoned the court administrator in Mobile County and informed them that she was going to be late because she had *212 had an asthma attack that morning. The circuit court indicated that she was one of the alternates and the following occurred:
“The Court: Do y’all have any objection to releasing her as an alternate?
“That being the case, it appears to me that [R.B.] will now take her place. Any objection?
“[Defense counsel]: No.
“[Prosecutor]: No, sir.
“The Court: All right. Are y’all ready to close your case?”
(R. 1426.) The record does reflect that juror S.J. was not an alternate. (R. 946.) However, this fact does not alter our analysis of this issue.
Luong did not object and, in fact, acquiesced to the circuit court’s removal of juror S.J. immediately before the closing arguments.
“ ‘Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.’ Phillips v. State, 527 So.2d 154, 156 (Ala.1988). ‘The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.’ Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).”
Robitaille v. State, 971 So.2d 43, 59 (Ala.Crim.App.2005). Thus, if error did occur it was invited by trial counsel’s acquiescence to the removal of S.J. Accordingly, to constitute reversible error any error must rise to the level of plain error.
Section 12-16-230 specifically grants a circuit court the authority to discharge a juror. This Code section states:
“If, before the jury retires, one of them becomes so sick as to incapacitate him for the performance of his duty or any other cause renders it necessary, in the opinion of the court, to discharge a juror, such juror may- be discharged, another summoned in his place and the trial commenced anew.”
(Emphasis added.) “Whether it is necessary for an alternate juror to replace a principal juror ... is a decision within the sound discretion of the trial judge subject only to review for an abuse of discretion.” Rocker v. State, 443 So.2d 1316, 1320 (Ala.Crim.App.1983). See Calhoun v. State, 530 So.2d 259, 264 (Ala.Crim.App.1988) (“After a night recess, a black female juror failed to return to court. The trial court delayed the trial for approximately 30 minutes and had the sheriff search for her. Being unable to locate her, the court replaced her, with the alternate juror, a white male. The action of the trial court was proper and, under the circumstances, clearly not an abuse of discretion.”). See also United States v. Colkley, 899 F.2d 297, 303 (4th Cir.1990) (“[T]he district court clearly did not abuse its discretion in ruling that the juror’s failure to appear for thirty minutes of testimony warranted substitution without further inquiry.”); United States v. Peters, 617 F.2d 503, 505 (7th Cir.1980) (“There is no abuse of discretion in dismissing the tardy juror here.... The judge had clearly informed the jury of the time to reconvene and all the other jurors understood his instructions. Since the day in question was the last day of trial, counsel were prepared at the opening of court to give their closing arguments and the court itself was prepared to charge the jury. [The trial court] doubtless did not want to delay the start of these proceedings out of a concern that the trial would carry beyond the end of the day.”).[11]
*213 The circuit court acted within the scope of § 12-16-230 by removing juror S. J. because she was late for the final day of the trial proceedings. For the reasons stated above, we find no reversible error in regard to this claim. Luong is due no relief on this claim.
XIII.
Luong next argues that prose-cutorial misconduct denied him a fair and impartial trial. Specifically, Luong argues that the prosecutor testified as to his personal beliefs, argued facts not in evidence, and misstated the evidence.
“ ‘In reviewing allegedly improper pros-ecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). “‘Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004).
“‘“While it is never proper for the prosecutor to express his personal opinion as to the .guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes- mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.” ’
“Allen v. State, 659 So.2d 135, 139 (Ala.Crim.App.1994) (quoting Sams v. State, 506 So.2d 1027, 1029 (Ala.1986)).
“‘“A prosecutor' as well as defense counsel has a right to present his impressions from the evidence,” and “[h]e may argue every legitimate inference from the evidence- and may examine, collate, sift, and treat the evidence in his own way.” Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).’
“Henderson v. State, 584 So.2d 841, 856-57 (Ala.Crim.App.1988).”
Brown v. State, 74 So.3d 984, 1017 (Ala.Crim.App.2010). “[Statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), “Although the failure to object will not preclude [plain-error] review,, it will weigh against any claim of prejudice.” Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008).
A.
First, Luong argues that it was error for the prosecutor to make the following argument in rebuttal at the conclusion of the closing arguments in the guilt phase:
*214 “Why? Why? It is very difficult to believe a parent would do that. That’s one of the hardest things in cases where children are intentionally killed by their parents, is most people cannot fathom that. It is so horrible and it is so awful, awful to think about and so beyond the realm of what most people can imagine that I think the natural tendency among people is to think there must be some excuse, there must be some reason.
“You know, sometimes there is just evil. Sometimes there is just evil. And that’s what we have in this case, ladies and gentlemen.”
(R. 1446-47.) Luong made no objection to the comment; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“The digest abounds with instances where the prosecutor has commented on the defendant’s character or appearance. Hall v. United States, 419 F.2d 582 (5th Cir.1969) (‘hoodlum’); Wright v. State, 279 Ala. 543, 188 So.2d 272 (1966) (‘Judas’); Rogers v. State, 275 Ala. 588, 157 So.2d 13 (1963) (‘a slick and slimy crow’); Watson v. State, 266 Ala. 41, 93 So.2d 750 (1957) (‘a maniac’); Weaver v. State, 142 Ala. 33, 39 So. 341 (1905) (‘beast’); Liner v. State, 350 So.2d 760 (Ala.Cr.App.1977) (‘a rattlesnake’ and ‘a viper’); Jones v. State, 348 So.2d 1116 (Ala.Cr.App.), cert. denied, Ex parte Jones, 348 So.2d 1120 (Ala.1977) (‘a purveyor of drugs’); Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.[(1976)]), cert. denied, Ex parte Kirkland, 340 So.2d 1140 (Ala.197[7]) (‘slippery'); Jeter v. State, 339 So.2d 91 (Ala.Cr.App.), cert. denied, 339 So.2d 95 (Ala.1976), cert. denied, 430 U.S. 973, 97 S.Ct. 1661, 52 L.Ed.2d 366 (1977) (‘a flim flam artist’); Cassady v. State, 51 Ala.App. 544, 545, 287 So.2d 254 (1973) (‘a demon’); Reed v. State, 32 Ala.App. 338, 27 So.2d 22, cert. denied, 248 Ala. 196, 27 So.2d 25 (1946) (‘lied like a dog running on hot sand’); Williams v. State, 22 Ala.App. 489, 117 So. 281 (1928) (‘a chicken thief'); Ferguson v. State, 21 Ala.App. 519, 109 So. 764 (1926) (‘a smart Aleck[’]); Quinn v. State, 21 Ala.App. 459, 109 So. 368 (1926) (‘a wild catter’); Thomas v. State, 19 Ala.App. 187, 96 So. 182, cert. denied, Ex parte Thomas, 209 Ala. 289, 96 So. 184 (1923) (‘a moral pervert’); Beard v. State, 19 Ala.App. 102, 95 So. 333 (1923) (‘a seducer’).”
Barbee v. State, 395 So.2d 1128, 1134 (Ala.Crim.App.1981).
We have upheld a conviction where the prosecutor called the defendant “coldblooded,” “evil,” “dark-hearted,” and “heartless.” See Albarran v. State, 96 So.3d 131, 184 (Ala.Crim.App.2011). Other courts have likewise upheld arguments where the prosecutor called the defendant “evil” and a “monster.” See State v. Webb, 133 So.3d 258, 274 (La.Ct.App.2014) (where the prosecutor said that the jury was “in the presence of evil”); Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir.2005) (where the prosecutor called the defendant “evil” and a “monster”); Hutchison v. Bell, 303 F.3d 720, 750 (6th Cir.2002) (where the prosecutor said that defendant had “evil ways” and was “an evil force”).
The prosecutor’s argument in this case did not constitute error. Neither did it “so infect the trial with unfairness” that Luong was denied due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Luong is due no relief on this claim.
B.
Luong next argues that the circuit court erred in commenting on Ling’s exercise of his constitutional rights when the prosecutor maligned his defense. Specifi *215 cally, he challenges the following argument by counsel in rebuttal at the guilt phase:
“January 8th statement: ‘So you slept okay? Yeah. And you didn’t do any dope before all of this, that’s what I wanted to know. No.’
“Again, January 8th statement: ‘You weren’t high or drunk or nothing? Nothing. Nothing at all. I not have money to. I not have no money.’
“It’s an excuse. The fact of the matter is, even when a person has been caught red-handed as he has, the Defense still has a right to come in here and try to get you to buy a story.”
(R. 1445; emphasis added.) Luong did not object to this argument; thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“Several courts have upheld the use of a similar slang — ‘cock-and-bull’ story — by the prosecutor during closing argument in reference to a criminal defendant’s defense.” State v. Clark, 83 Haw. 289, 305, 926 P.2d 194, 210 (1996).
The Montana Supreme Court stated:
“In his closing remarks, the prosecutor called the defendant’s misidentification defense a ‘cock and bull story’ and a ‘smokescreen,’ referred to the defendant as a liar, said defense counsel was ‘bold’ and called into question the credibility and motives of several defense witnesses. Weaver characterizes the state’s closing arguments as portraying defense counsel as having suborned perjury. Comments to the effect that a defendant or a defense witness were lying have repeatedly been upheld. A prosecuting attorney may comment on the evidence and the credibility of witness and, in the process, may belittle and point to the improbability and untruthfulness of specific testimony. State v. Johnson, 496 S.W.2d 852, 859 (Mo.1973). Here the comments on the testimony of the witnesses were well within the range of the prosecutor’s adversarial responsibilities in making closing argument.”
State v. Weaver, 912 S.W.2d 499, 513 (Mo.1995).
The prosecutor’s argument in rebuttal that Huong’s defense was “an excuse” did not constitute error. Neither did it “so infect the trial with unfairness” that Luong was denied due process. See Darden v. Wainwright, supra. Luong is due no relief on this claim.[12]
XIV.
Luong next argues that two of the circuit court’s jury instructions in the penalty phase were erroneous. At the conclusion of the circuit court’s instructions in the penalty phase, the following occurred:
“The Court: Are there any exceptions by the State?
“[Prosecutor]: No, sir.
“The Court: Any by the Defense?
“[Prosecutor]: No, sir.”
(R. 1663.) Luong made no objections to the two instructions he challenges on appeal. Therefore, we review the challenged instructions only for plain error. See Rule 45A, Ala. R.App. P.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘“the court’s charge must be taken as a whole, *216 and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 620 So.2d 235, 237 (Ala.Cr.App.1987)); see also. Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 796 So.2d 753, 780 (Ala.Crim.App.1999).
In applying the plain-error standard of review to jury instructions, this Court has stated:
“ ‘In setting, out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the-proposition that ‘an, error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710. So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’"”
Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882 (Ala.Crim.App.1998).
A.
Luong first argues that the circuit court’s jury instruction on the heinous, atrocious, or cruel aggravating circumstance was erroneous because, he says, the instruction did not sufficiently limit the jury’s application of this aggravating circumstance and the instruction allowed a finding of this aggravating circumstance if the murders were merely “especially atrocious” arid not also “conscienceless or pitiless.”
The circuit court gave the following instruction on this aggravating circumstance:
‘‘[A]s to the second aggravating circumstance, and that is that it was especially heinous, atrocious and cruel, the term ‘heinous’ means extremely wicked or shockingly evil. The term ‘atrocious’ means outrageously wicked or violent. The term ‘cruel’ means designed to inflict a high degree of pain with utter indifference.
“For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily torturous to the victim ei.ther physically or psychologically.
“What is intended to be covered under this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which always will exist when a capital offense is committed.”
(R. 1652-53.)
The instruction given in this case was similar to the instruction this Court upheld in McWilliams v. State, 640 So.2d 982 (Ala.Crim.App.1991). In McWilliams we stated:
“These instructions were sufficient to overcome the vagueness condemned in Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (wherein the United States Supreme Court held that the words ‘especially heinous, atrocious, or cruel,’ without more, ai*e unconstitutionally vague, as they fail to sufficiently inform juries of what they must find in order to impose the death penalty). See also Lawhorn v. State, 574 So.2d 970 (Ala.Cr.App.1990) ... (wherein the trial court gave the following instruction to the jury concerning this aggravating circumstance: ‘[a]n-other one that you could consider but is not proven by your verdict is that the capital offense was. especially heinous, *217 atrocious, or cruel, compared with other capital offenses as set out in Subdivision 8 defining aggravating circumstances’).
“However, where sufficient guidance is given to the jury by the trial court’s adequately defining the terms used so that the jury is made aware of wfyat it must find in order to impose the death penalty, such an instruction is constitutionally acceptable. See Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 2968-69, 49 L.Ed.2d 918 (1976). In Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), the appellant challenged a jury instruction concerning this aggravating circumstance, which was similar to the one given in the present case, as unconstitutionally vague. That trial court instructed the jury as follows:
“‘The word ‘heinous’ means extremely wicked or shockingly evil. The term ‘atrocious’ means outrageously wicked and vile. The term ‘cruel’ means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of[,] the suffering of others.
“ ‘What is intended to be included in this aggravating circumstance is those cases where the actual commission of a capital offense is accompanied by such additional- acts as to set the crime apart from the norm of capital offenses.
“ ‘For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense.- For a capital offense to be especially cruel, it must be [a] consciousless or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness -or atrociousness or cruelty exceeds that which [normally] exists when a capital offense is committed.’
“Id. at 385-86. This court held that these instructions met the constitutional standard and sufficiently overcame the vagueness prohibition of Maynard v. Cartwright, supra. This court held:
“ ‘These instructions were proper and furnished adequate guidance to the jury. The court’s instructions that this aggravating circumstance should apply to the. consciousless or pitiless crime which is unnecessarily tortuous to the victim and one in which the brutality exceeds that which is normally present in any capital offense met the requirements of law. See Proffitt v. Florida, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976); Ex parte Kyzer, 399 So.2d 330 (Ala.1981); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied [493 U.S. 945], 110 S.Ct. 354 [107 L.Ed.2d 342] (1989).’
“Haney [v. State, 603 So.2d 368] at 386 [ (Ala.Crim.App.1991) ].”
640 So.2d at 996-97.
Here, the instruction on the especially heinous, atrocious, or cruel aggravating circumstance was sufficient to limit the application of this aggravating circumstance to “those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” Broadnax v. State, supra. For these reasons, we find no plain error in the circuit court’s instructions on this aggravating circumstance. Luong is due no relief on this claim. .
B.
Luong next argues that the circuit .court’s jury instruction on the aggravating circumstance that Luong intentionally *218 caused the death of two or more persons by one act or pursuant to one scheme or course of conduct was erroneous because, he says, the instruction did not require the jury to make a separate factual finding at sentencing that this aggravating circumstance applied in this case.
The circuit court gave the following instruction on this aggravating circumstance:
“[Luong] has been convicted of the capital murder of two or more persons by one act or pursuant to one scheme or course of conduct. Finding Lam Luong guilty as charged in the indictment establishes by law the existence of one of the aggravating circumstances. This offense necessarily includes as an element the following aggravating circumstance as provided by the law of this state: That [Luong] intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. By law, your verdict in the guilt phase finding [Luong] guilty of this capital offense established the existence of this aggravating circumstance beyond a reasonable doubt. This aggravating circumstance is included in the list- enumerated statutorily in the aggravating circumstances permitting you to consider death as an available punishment. This aggravating circumstance, therefore, shall be considered by you in deciding whether to recommend a sentence of life imprisonment without parole or death.”
(R. 1651-52.)
This Court addressed this specific issue in Lawhorn v. State, 581 So.2d 1159, 1170 (Ala.Crim.App.1990), and stated:
“In the sentencing phase, the trial court instructed the jury that its verdict, finding appellant guilty of murder pursuant to a contract, established the existence of the aggravating circumstance that the capital offense was committed for pecuniary gain, § 13A-5-49(6)[, Ala. Code 1975]. Appellant argues that this instruction removed, from the jury’s consideration, ‘an inquiry critical to determine [his] sentence,’ and it placed the burden of proof on the defense to show that the mitigating factors outweighed the aggravating ones.
“The statute provides that the finding and consideration of the relevant aggravating circumstance of § 13A-5-49(6) is not precluded by its inclusion in the definition of the capital offense charged, in this case, under § 13A-5-40(a)(7). Ala.Code § 13A-5-50 (1975). Our statutory scheme also provides the following:
“ ‘At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.’
“Ala.Code § 13A-5-45(e). See also Ex parte Ford, 515 So.2d 48, 52 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988).
“Recognized by these statutes and implicit in their operation is the fact that the jury, by its verdict, had already made, in essence, the ‘critical inquiry’ of whether the aggravating circumstance, encompassed in the indictment, is present. - Thus, the court’s instruction did not remove, from the jury’s consideration, the determination of whether the aggravating circumstance existed, for that determination had already been made by the jury.
“ ‘The use of “aggravating circumstances,” is not an end in itself, but a means of genuinely narrowing the *219 class of death-eligible persons and thereby channeling the jury’s discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.’
“Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988).”
In Duren v. State, 507 So.2d 111 (Ala.Crim.App.1986), we also stated:
“The aggravating circumstance that the capital offense was committed during a robbery, § 13A-5-49(4), corresponds to the aggravation alleged in the indictment of murder during a robbery, § 13A-5-40(a)(2).... In this case, the trial judge could have directed the jury to find the presence of that aggravating circumstance.
“ ‘The aggravating circumstance relied upon by the prosecution may be the one corresponding to the aggravating component in the indictment. If so, the instruction may be directory in form. Thus, depending upon the facts of the case, a jury may be told either to search the evidence for one or more aggravating circumstances, or they may be told that their verdict of guilty established the presence of an aggravating circumstance. See Ex parte Kyzer, 399 So.2d 330, 335 (Ala.1981); Ala.Code § 13A-5-50 (Supp.1981).’ J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala. L.Rev. 213, 323, n. 743 (1982).
“See also E. Carnes, Alabama’s 1981 Capital Punishment Statute, 42 Ala. Law. 456, 482-83 (1981).”
507 So.2d at 114.
It was not error for the circuit court to rely on the jury’s verdict in the guilt phase and to instruct the jury that the aggravating circumstance that Luong murdered the four children by one act or pursuant to one scheme or course of conduct had been proven beyond a reasonable doubt by its verdict in the guilt phase. Similar directory instructions have been approved by this Court. See Lawhorn, supra; Duren, supra. No error, much less plain error, occurred in regard to this claim. Luong is due no relief on this claim.
XV.
Luong argues that his sentence of death violates the Equal Protection Clause of the Constitution and is gender-biased because, he says, more men are sentenced to death than women. Luong cites a law-journal article in support of this argument. See Victor Streib, Gendering the Death Penalty: Countering Sex Bias in a Masculine Sanctuary, 63 Ohio St. L.J. 433 (2002).
This issue is raised for the first time on appeal. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In rejecting a claim that Georgia’s death-penalty statute discriminated on the basis of race, the United States Supreme Court in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), stated:
“[T]he claim that [the death] sentence rests on the irrelevant factor of race easily could be extended to apply to claims based on unexplained discrepancies that correlate to membership in other minority groups, and even to gender. ... Also, there is no logical reason that such a claim need be limited to racial or sexual bias. If arbitrary and capricious punishment is the touchstone under the Eighth Amendment, such a claim could — at least in theory — be based upon any arbitrary variable, such as the defendant’s facial characteristics, *220 or the physical attractiveness of the defendant or the victim, that some statistical study indicates may be influential in jury decisionmaking. As these examples illustrate, there is no limiting principle to the type of challenge brought by McCleskey. The Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment,”
481 U.S. at 315-19.
Other courts have addressed this issue. The Tennessee Supreme Court in State v. Hall, 958 S.W.2d 679 (Tenn.1997), stated:
“[T]he defendant argues that the death penalty statute has been imposed dis-criminatorily -on the basis of economics, race, gender and geographic region in the state. This argument has been rejected by the supreme court. See [State v.] Brimmer, 876 S.W.2d [75] at 87 n. 5 [ (Tenn.1994) ]; [State v.] Cazes, 875 S.W.2d [253] at 268 [(Tenn.1994)]; [State v.] Smith, 857 S.W.2d [1] at 23 [ (Tenn.1993) ]; State v. Evans, 838 S.W.2d 185, 196 (Tenn.1992). Moreover, the record is devoid of evidence indicative of an individualized showing of improper discrimination with regard to the sentencing of the defendant in this case. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 292-93, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); Cooper [v. State], 847 S.W.2d [521] at 531 [ (Tenn.Crim.App.1992) ].”
958 S.W.2d at 717.
The Arizona Supreme Court in State v. Stokley, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995), stated:
“Defendant argues that poor, male defendants are discriminated against in the application of the death penalty. A defendant alleging .discrimination must prove ‘the decisionmaker[ ] in his case acted with discriminatory purpose.’ McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987). Defendant offers no evidence that his economic status or gender contributed to his sentence or biased the sentencing process. See Jeffers v. Lewis, 38 F.3d 411, 419 (9th Cir.1994), cert. denied, 514 U.S. 1071, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995); see also State v. White, 168 Ariz. 500, 513, 815 P,2d 869, 882 (1991) (death penalty statute is. gender neutral), cert. denied, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). Absent evidence of purposeful discrimination, this argument has been rejected. [State v.] Apelt, 176 Ariz. [369] at 373, 861 P.2d [654] at 658 [ (1993) ].”
182 Ariz. at 516, 898 P.2d at 465.
Here, as in Hall and Stokley, “the record is devoid of any evidence indicative of an individualized showing of improper discrimination” with regard to Luong’s sentence of death. Luong is due no relief on this claim.
XVI.
Luong next argues that the circuit court made errors in its sentencing order that rise to the level of plain error. He makes several different arguments in support of this contention.
Because Luong did not object to any alleged errors in the circuit court’s sentencing order our review is limited to determining whether plain error is present. See Rule 45A, Ala. R.App. P. “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998).
The purpose of a written sentencing order in a death case is to aid the *221 appellate court in reviewing the propriety of the lower court’s sentence of death. Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). This Court-has recognized that some errors in a sentencing order require remand and that other errors- are “technical errors” that resultin' no -injury to the appellant and are harmless. See Spencer v. State, 58 So.3d 215 (Ala.Crim.App.2008) (remanding case for the court to set out its reasons for overriding the jury’s recommendation of life imprisonment without parole); Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000) (remanding ease for court to make specific findings of facts as to each aggravating circumstance and each mitigating circumstance set out in § 13A-5-49, Ala.Code 1975, and § 13A-5-51, Ala.Code 1975); Ex parte Tomlin, 443 So.2d 47 (Ala.Crim.App.1979) (remanding case after trial court improperly considered an aggravating circumstance that was not a statutory aggravating circumstance). See also Gavin v. State, 891 So.2d 907 (Ala.Crim.App.2003) (holding that trial court’s failure to enter specific findings as to all aggravating circumstances when it specifically found and made findings concerning the existence of three aggravating circumstances was not plain error); Sockwell v. State, 675 So.2d 4, 30 (Ala.Crim.App.1993) (“While some of the factual matters in the trial court’s sentencing order were not based upon evidence contained in the record, we hold that error in the trial court’s sentencing order is not so egregious as to require a new sentencing order.”).
“While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order.... ‘[T]he harmless error rule does apply in capital cases at the sentence hearing.’ Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). ‘As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are “so clear and convincing-that virtually no reasonable person could differ,” a harmless error analysis can be used.’ Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984). See also Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed, Ex parte Thompson, 503 So.2d 887 (Ala.), cert. denied, Thompson v. Alabama, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).”
Fortenberry v. State, 545 So.2d 129, 144 (Ala.Crim.App.1988).
With these principles in mind, we review the claims raised by Luong concerning the circuit court’s sentencing order.
A.
Luong first argues that the circuit court made several factual errors in its sentencing order that mandate that his conviction be reversed or,- at the least, that his case be remanded for correction of those errors.
1.
First, Luong argues that the circuit court made factual errors in its findings on the heinous, atrocious, or cruel aggravating circumstance and that those facts were not supported by the evidence presented at Luong’s trial.
In finding this aggravating circumstance, the circuit court made the following findings of fact:
“Regarding the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, the Court notes that Jeff Coolidge saw one ‘object’ being thrown off the bridge and three toddlers remaining in the van. It is, therefore, reasonable to infer that 4 *222 month old Danny was the first to be thrown to this death. It also seems reasonable to conclude that the other three children, particularly [three] year old Ryan, who had been described as very smart and very protective of his siblings, would have knowledge of the circumstances around him. Subjecting him, and perhaps the other toddlers, to this situation, is. heinous, atrocious and cruel compared to other capital offenses. The feeling of falling produces a visceral reaction in the body; a jolt of adrenaline that some people seek out for thrills as skydiving or bungee jumping, but that would, in these circumstances, most likely produce sheer, unmitigated terror. The children, who Luong said were afraid of the water, suffered the agony of a fall over 100 feet, their small bodies crashing into the water with such force that the skull cracks, the brain bleeds, probably leaving each child gasping for breath for an unspecified period of time while the lungs fill with water. The evidence established that the children were alive and alert at the time they were thrown into the water and they did not die quickly. This would have produced extreme fear and pain. This is heinous, atrocious and cruel compared to other capital offenses. Therefore, the terror and pain [Luong] caused his children is considered and the Court finds this aggravating circumstance was proven beyond a reasonable doubt and weights heavily in favor of imposing the death penalty.”
(C. 883-84) (emphasis added). Luong challenges the highlighted portions of the ox-der.
Although it is true that no dii-ect testimony was presented as to the exact amount of time it took the victims to die, a reasonable inference may be made from the evidence that the victims did not die quickly. Testimony showed that all four victims were thrown from a height of 106 feet off a bridge, that each victim was alive when he or she hit the water, and that their bodies traveled at a speed of 25 miles per hour before hitting the water. Each victim sustained traumatic blunt-force injuries to the head. Danny, Ryan, and Lindsey died of blunt-force trauma and asphyxia due to drowning. Hannah died of asphyxia due to drowning. The coroner testified in detail about how di-owning affects a person’s body. She said that each of the victims in this case had water or fluid in their lungs and that in drowning you see “tiny hemorrhages or burst blood vessels over some of the organs. And that’s seen in deaths due to asphyxia or struggling to breathe when you aren’t getting oxygen.” (R. 1381.) Certainly, the highlighted remarks made by the circuit court in its sentencing order are supported by the coroner’s testimony and the testimony concerning the circumstances surrounding the murders.
In regard to this aggravating circumstance, Luong also argues that this circumstance was incorrectly applied in this case.
 “The especially heinous, atrocious, or cruel aggravating circumstance ‘applfies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ ” Wimbley v. State, 191 So.3d 176, 242 (Ala.Crim.App.2014).
“There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological toiture on the victim. See Nor *223 ris v. State, 793 So.2d 847 (Ala.Crim.App.1999).”
Brooks v. State, 973 So.2d 380, 417-18 (Ala.Crim.App.2007).
“A victim’s age and physical condition are relevant when assessing this aggravating circumstance.” Gobble v. State, 104 So.3d 920, 986 (Ala.Crim.App.2010). As stated above, the four young victims, all under the age of four, were thrown off of a 106-feet high bridge and died of blunt force trauma and asphyxia due to drowning. It is hard to imagine a case where the application of this aggravating circumstance is more warranted. By any person’s definition, the murders in this case were especially heinous, atrocious, or cruel as compared to other capital offenses. See also Walker v. State, 707 So.2d 300 (Fla.1997) (finding death by drowning to be heinous, atrocious, or cruel); Marshall v. State, 963 P.2d 1 (Okla.Crim.App.1998) (finding death by asphyxia due to drowning was especially heinous, atrocious, or cruel).
This aggravating circumstance was correctly found to exist in this case. Luong is due no relief on this claim.
2.
Luong also asserts that the sentencing order contained factual inaccuracies about Ling’s conduct while he was on the bridge. He asserts that the circuit court stated that Luong waited for cars to pass before throwing a child over the bridge when Luong said in his statement to police that he did not pay attention to the traffic.
As stated previously in this opinion, two witnesses, Jeff Coolidge and Frank Collier, testified that they observed Luong on the top of the bridge as they passed his parked van. Neither said that they witnessed a child being thrown from the bridge when they were close enough to observe Luong. Coolidge said that before he reached the van, from a distance, he saw what appeared to be a bag being thrown over the side.
The circuit court’s finding is a reasonable inference that could have been drawn from the testimony of Coolidge and Collier. As we have stated: ■
“[S]everal of the general facts as set forth in the trial court’s sentencing order are reasonable inferences from the evidence produced at trial. While some of the factual matters in the trial court’s sentencing order were not based upon evidence contained in the record, we hold that error in the trial court’s sentencing order is not so egregious as to require a new sentencing order.”
Sockwell v. State, 675 So.2d 4, 30 (Ala.Crim.App.1993).
The circuit court’s statements were supported by Coolidge’s and Collier’s testimony. The statements did not constitute plain error and Luong is due no relief on this claim.
3.
In one paragraph in this section of his brief Luong argues that the circuit court misstated facts when it wrote in the summary of facts that Luong would not work when the family lived in Georgia when, in fact, his wife had testified that he worked two different jobs when they lived in Georgia.
The circuit court stated the following in its summary of the facts surrounding the case:
“Some time after Hurricane Katrina in August of 2005, they moved to Hines-ville, Georgia. Kieu worked in a nail salon and [Luong] first worked at a car wash and then took a job as a chef at a restaurant. But, it was also in Hines-ville that marital problems arose. *224 [Luong] took a girlfriend, he wouldn’t work, and he was smoking crack.”
(C. 878.) The circuit court’s statements are supported by the record. Kieu Phan testified that when they lived in Hinesville, Georgia, Luong had several jobs but that he stopped going to work and, instead, spent all of his time with his girlfriend and as a result he got fired from his job. (R. 1031.) The circuit court made no misstatement of facts in this section of the sentencing order. This claim is not supported by the record, and Luong is due no relief.
4.
In one paragraph in this section of his brief Luong argues that the circuit court incorrectly stated that it had “considered all of the information contained in the presentence report,” when, in fact, the report contained erroneous information. Luong asserts that the presentence report incorrectly stated that Luong told a police officer that “his children were happy now”; however, Luong says he never made that statement.
The record shows that, when the circuit court specifically asked counsel if he had any problems with the information contained in the presentence report, the following occurred:
“The Court: I’ve been provided with a copy of a presentence investigation [report] which I ordered, and I have had a chance to study it. [Defense counsel] have you received a copy?
“[Defense counsel]: Your Honor, we did. And we went over it with Mr. Luong with an interpreter to make sure there wasn’t any misunderstanding about what it contained. We went over it and he said it is correct.
“The Court: Okay. I want to ask. Mr. Luong, would you please stand, sir?
“(Defendant complies.)
“The Court: I am holding what I have marked as Court’s Exhibit 1 for the purpose of this sentencing, which is the Alabama Board of Pardons and Parole’s Report of Investigation — Presentence Investigation. And I want to make sure that you have had a chance to read this, or have someone read it to you.
“[Luong]: Yes, sir.
“The Court: Is everything contained in this presentence investigation accurate, or is there anything you would like to change other than possibly the details of the offense that are alleged in here?
“[Luong]: No.”
(R. 1668-69.) Thus, if any error did occur in the presentence report it was invited by Luong’s actions. See Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003). This issue does not rise to the level of plain error, and Luong is due no relief on this claim.
B.
Luong next argues that the circuit court, in its sentencing order, referenced a report by Dr. Paul K. Leung when no report had been compiled by Dr. Leung. Specifically, Luong challenges the following statement in the court’s sentencing order: “The Court has carefully reviewed and weighed both the report and testimony of Dr. Paul K. Leung, in the context of the facts underlying the offenses charged and proven.” (C. 887.)
This Court’s records show that after the trial record had been certified and filed with this Court, Luong attempted to have the record supplemented with the written report completed by Dr. Leung that had been referenced in the circuit court’s sentencing order. However, the circuit court informed this Court that: “After contacting trial counsel for [Luong], this court has confirmed that no report of Dr. Paul K. Leung is contained in the court file be *225 cause no written report was issued by Dr. Leung.” (Third suppl. P. 23.)[13]
It is clear after reading this portion of the circuit court’s sentencing Order that its reference to a nonexistent report was clearly merely a misstatement that in no way contributed to Ling's sentence of death. “Factual errors in a sentencing order are subject to harmless error analysis.” Merck v. State, 975 So.2d 1054, 1066 n. 5 (Fla.2007). We find no plain error in regard to this claim, and Luong is due no relief on this claim.
C.
‘ Luong next argues that the circuit court erred in failing to consider certain evidence of his mental condition as mitigating because, he argues, the evidence did not rise to the level of the definition of insanity. He makes several different arguments in support of this contention.
1.
First, Luong argues that the circuit court erred in not applying the statutory mitigating circumstance that Ling’s ability to “appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.” See § 13A-5-51(6), Ala.Code 1975.
The circuit court made the following findings on this statutory mitigating circumstance:
“There was no compelling evidence that [Luong] was under the influence of alcohol or drugs at the time he killed his children. To the contrary, in his statements to the police he said that he was not under the influence of anything. Furthermore, his actions, as outlined ... above indicate that he was engaging in very purposeful behavior. Simply stated, there was no evidence to indicate that [Luong] could not appreciate the criminality of his conduct or conform his conduct to the requirements of law. It is apparent that the jury believed Luong was able to ‘appreciate the criminality of his conduct’ and that- ability ‘to conform his conduct to the requirements of law was not substantially impaired’ when it rejected Luong’s argument for a lesser included conviction of manslaughter based on.a voluntary intoxication theory. In finding Luong guilty of capital murder, the jury necessarily rejected the theory that he was so intoxicated that he failed to form- an intent to commit murder. This Court agrees with the jury in this regard and further specifically finds that [Luong] could appreciate the criminality of his conduct and conform his conduct to the requirements of law. Accordingly, this Court assigns no weight to this statutory mitigator.”
(C. 888^-89.)
In applying the mitigating circumstance contained in § 13A-5-51(6), Ala.Code 1975, this Court has stated:
“Voluntary intoxication will not constitute the mitigating circumstance that the i defendant’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating the criminality of his conduct.”
Williams v. State, 710 So.2d 1276, 1346 (Ala.Crim.App.1996). The circuit court’s findings are consistent with this Court’s interpretation of § 13A-5-51(6), Ala.Code 1975.
*226 Moreover, the circuit court stated the following concerning the nonstatutory mitigating circumstances regarding Luong’s mental health:
“Mental and emotional problems: Refer to subsection ‘c’ under the heading of statutory mitigators. The only difference in that statutory mitigator and this non-statutory mitigator is that in this case the mental and emotional problems are not alleged to be ‘severe.’ Accordingly, the Court finds that Luong did suffer from some degree of emotional problems, but assigns this nonstatutory miti-gator very little weight for the reasons set forth in subsection ‘s’ under the heading of statutory mitigators.”
(C. 891.)
The circuit court did consider Luong’s “mental problems” to be a nonstatutory mitigating circumstance and gave them little weight. The circuit acted within its discretion in not applying the statutory mitigating circumstance contained in § 13A-5-51(6), Ala.Code 1975. Luong is due no relief on this claim.
2.
Luong next argues that the circuit court erred in refusing to find as a mitigating circumstance that the murders were committed “while the defendant was under the influence of extreme mental or emotional disturbance.” See § 13A-5-51(2), Ala.Code 1975.
The circuit court made the following findings on this mitigating circumstance:
“Luong offered the testimony of Dr. Paul K. Leung, a psychiatrist, who testified that [Luong] was under the influence of extreme mental or emotional disturbance. He testified that [Luong] suffered from problems associated with his longstanding drug abuse, including crack cocaine, and depression. The Court has carefully reviewed and weighed both the report and testimony of Dr. Paul K. Leung, in the context of the facts underlying the offenses charged and proven.[14]
“The value of human life mandates that [Luong’s] troubled history and possible psychological disorder — not psychosis — be balanced against the conclusions [Luong] could appreciate the wrongfulness of his acts and was competent and in control at the time of this horrific criminal event. The conclusion is fortified by [Luong’s] conduct on January 7, 9, 2008, and thereafter. He had the guile to attempt to deny or minimize his participation in the crime in his initial statements to investigators and then his subsequent confession. Dr. Leung acknowledged that [Luong’s] problems were of his own making, and that during the time period surrounding the murder of his children, he engaged in very purposeful behavior. Examples of this behavior include loading the children in the van, going back for Ryan, waiting for cars to pass before throwing a child over, convincing people to assist him with obtaining gasoline, chatting with the wrecker driver, Donnie Mizell, in a very normal manner, concocting a story to avoid criminal prosecution. Dr. Leung also testified that in the Asian culture men are higher in status than women and generally do not tolerate *227 disapproval from women very well. Rather than engaging in physical violence, the man would more likely seek to inflict emotional torture. This supports [Luong’s] assertion that he killed the children to, in essence, get revenge on his wife. Therefore, the Court finds that [Luong] did not suffer from an ‘extreme mental or emotional disturbance’ at the time he murdered his children. Accordingly, because this statutory miti-gator does not exist, this Court gives it no weight”
(C. 886-88.)
Although Luong may submit any evidence in mitigation, the circuit court has the discretion to consider that evidence as mitigation or not. As we stated in Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999):
“Although evidence is presented concerning mitigation, the trial court is not obliged to find that that evidence is indeed mitigating. As we stated in Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999):
“‘Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstances is proven and the weight to be given it rests with the sentences Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).’ ”
789 So.2d at 939.
“The United States Supreme Court’s decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), requires that a circuit court consider all evidence offered in mitigation when determining a capital defendant’s sentence. However,
“ ‘ “Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981) ]; Smith [v. State, 407 So.2d 894 (Fla.1981) ].” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).’
“Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999). ‘“Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.” ’ Simmons v. State, 797 So.2d 1134, 1182 (Ala.Crim.App.1999), quoting Wilson v. State, 777 So.2d 856, 893 (Ala.Crim.App.1999). ‘ “While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is .actually found to be mitigating is in the discretion .of - the sentencing authority.” ’ Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989).”
Albarran v. State, 96 So.3d 131, 212-13 (Ala.Crim.App.2011).
When discussing the application of § 13A-5-51(2), Ala.Code 1975 — the mitigating circumstances that the defendant was under the influence of extreme mental or emotion disturbance and that the defendant lacked the capacity to appreciate the criminality of his conduct — this Court has stated:
“ ‘[A] factfinder is not bound by expert testimony “even if all of the witnesses are presented by only one side.” ’ Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App. *228 1990). ‘In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted,’ Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). ‘An expert’s opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.’ Williams v. City of Northport, 557 So,2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). ‘Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact,’ Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L,Ed.2d 276 (1985).”
Carroll v. State, 599 So,2d 1253, 1272 (Ala.Crim.App.1992). See also Kocaker v. State, 119 So.3d 1214, 1230 (Fla.2013) (“[Cjompetent, substantial evidence supports the trial court’s rejection of [of expert’s testimony concerning] the ‘extreme mental or emotional disturbance’ mitigator.”); People v. Baez, 241 Ill.2d 44, 123, 349 Ill.Dec. 165, 946 N.E.2d 359, 405 (2011) (“[E]xpert testimony does not necessarily establish [extreme-mental-or-emotional-disturbance] factor; even where the testimony of an expert in mitigation is unrebut-ted, the credibility and weight given to the testimony is determined by the trier of fact.”).
The circuit court acted within its discretion in declining to apply this statutory mitigating circumstance. Luong is due no relief on this claim.
3.
Luong next argues that the circuit court erred in declining to find his drug abuse to be a mitigating circumstance.
The circuit court made the following findings related to Luong’s drug abuse:
“Drug abuse: There is evidence that Luong had abused drugs for .years, particularly crack cocaine. There is no dispute about that. However, Luong’s drug abuse was voluntary and did not impact his ability to engage in purposeful behavior in achieving his objective of killing his children. It did not affect his ability to know right from wrong, the nature and quality or wrongfulness of his actions. Accordingly, the Court assigns very little weight to this mitigating circumstance.”
(C. 891.) See Roll v. Bowersox, 177 F.3d 697, 699 (8th Cir.1999) (“[D]rug abuse may or may not be considered a mitigating circumstance, depending on the facts.,.. ”); State v. Goff, 82 Ohio St.3d 123, 133, 694 N.E.2d 916, 925 (1998) (“The trial court’s statement that it ‘assigns no weight to this as a mitigating factor’ indicates clearly that the trial court did not ‘refuse to consider’ alcohol and drug abuse as a mitigating factor.”).
The circuit court acted within the scope of its discretion in assigning this nonstatu-tory mitigating circumstance little weight. Luong is due no relief on this claim.
D.
Luong argues that the circuit court erred in failing to find that his remorse was a nonstatutory mitigating circumstance.
In fact, in the conclusion of the circuit court’s sentencing order the court specifically stated: “[Luong] has shown no remorse for his actions.” (C. 894.) “While *229 [the appellant’s] alleged remorse and apparent cooperation possibly could have been considered as non-statutory mitigating circumstances, pursuant to Code 1975, § 1SA-5-52, whether to consider them as such was within the discretion of the trial judge.” Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.1985). See also Knotts v. State, 686 So.2d 431, 446 (Ala.Crim.App.1995).
The circuit court acted within its discretion in declining to find Luong’s -remorse to be a nónstatutory mitigating circumstance. Luong is due no relief on this claim.
E.
Luong argues that the circuit court erred in assigning no weight to the statutory mitigating circumstance that Luong had no significant history of prior criminal activity as set out § 13A-5-51(l), Ala.Code 1975.
In regard to this mitigating circumstance, the circuit court stated:
“During the sentencing phase of Luong’s trial, the State proffered certified evidence that Luong had previously been convicted of a felony drug charge in Mississippi. However, Luong has no history of violence and no significant criminal history other than the aforesaid drug conviction. Therefore, the Court finds that this mitigator does exist but this Court did not consider this prior conviction in arriving at its sentencing decision. Accordingly, the Court assigns it no weight.”
(C. 886) (emphasis added).[15]
“Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.” Wilson v. State, 777 So.2d 856, 893 (Ala.Crim.App.1999). “The weight to be attached to the mitigating evidence is strictly within the discretion of the sentencing authority.” Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). “A sentencing authority can assign whatever weight it deems appropriate to those mitigating circumstances it finds to exist.” Jackson v. State, 791 So.2d 979, 1036 (Ala.Crim.App.2000).
The circuit court was within its discretion in declining to apply this statutory mitigating circumstance. Luong is due no relief on this claim.
F.
Luong next argues that the circuit court erred in not considering his lack of future dangerousness and his ability to adapt to prison life as a nonstatutory mitigating circumstances. Specifically, he argues that Dr. Leung testified that Luong would be able to adapt to prison life and the court should have found this to be a mitigating circumstance.
“The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstances.” Calhoun v. State, 932 So.2d 923, 975 (Ala.Crim.App.2005). The circuit court acted within it discretion in declining to find his lack of future dangerousness and his ability to adapt to prison life. Luong is due no relief on this claim.
G.
Luong next argues that the circuit .court erred in not finding that, his abusive childhood was entitled to more weight as a mitigating circumstance.
*230 The circuit made the following findings on this nonstatutory mitigating circumstance:
“Childhood problems: The testimony of Dr. Leung and Luong’s cousin give rise to a duty to consider the non-statutory mitigating circumstances. It is irrefutable that [Luong] is the product of an abusive environment lacking in nur-turance and emotional support as a young person. These factors though regrettable are not a license for violence, nor do they justify any act of senseless rage or depraved conduct directed at innocent human beings. Were this the case every person from a deprived background could explode at will without fear of consequence. Luong’s cousin testified that Luong suffered discrimination and was ostracized during his childhood in Vietnam because he was the product of an African-American serviceman and a Vietnamese woman. While the Court finds that this is unfortunate, other evidence also established that [Luong] had a loving relationship with his grandparents who raised him as a small child; he came to the United States when he was 13 years old and had a very supportive foster family; he is a bright and resourceful person who had many opportunities in the United States. The Vietnam conflict produced many children of the same ethnic background as [Luong], including the cousin of [Luong] who testified that she too was treated poorly as a child because of her ethnicity, and the grandmother of the murdered children. The Court finds that this mitigator was sufficiently interjected by Luong and not disproved by the State. Accordingly, this Court gives this mitigator some weight.”
(C. 889-90.)
“The weight to be attached to the ... mitigating evidence is strictly within the discretion of the sentencing authority.” Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). See also Douglas v. State, 878 So.2d 1246, 1260 (Fla.2004) (“[T]he trial court did not abuse its discretion in giving little weight to the mitigating facts relating to [the defendant’s] abusive childhood.”); State v. Rizzo, 303 Conn. 71, 174, 31 A.3d 1094, 1158 (2011) (“[P]roven facts such as childhood abuse and/or neglect, or divorced and/or otherwise struggling parents, do not invariably result in proven mitigating factors.”); Mays v. State, 318 S.W.3d 368, 394 (Tex.Crim.App.2010) (“Mental illness, like childhood abuse, is not mandatorily mitigating....”); Blanche v. State, 690 N.E.2d 709, 715 (Ind.1998) (“Evidence of a troubled childhood does not require a trial court to find it a mitigating circumstance.”).
The circuit court acted within its discretion in declining to give Luong’s abusive childhood more weight as a nonstatutory mitigating circumstance. Luong is due no relief on this claim.
H.
Luong next argues that the circuit court erred in applying two nonstatutory aggravating circumstance. Specifically, he argues that the following comments show that the court erroneously applied two nonstatutory aggravating circumstances— that the victims were innocent children and that Luong’s motive to kill was to torture his wife. In support of this argument Luong cites the following portion of the circuit court’s sentencing order:
“In this case, the outcome is clear. In recommending a sentence of death by a vote of 12-0, the jury correctly and unanimously determined that the aggravating circumstances in this case outweighed the mitigating circumstances. In fact, this Court finds that the aggra *231 vating circumstances far outweigh the mitigating circumstances.
“Ryan, Hannah, Lindsey and Danny were innocent children, murdered by the man who should have been their protector, their father. Luong wanted to emotionally torture his wife, which he clearly did, because she wanted him to work, quit doing crack and behave as a responsible husband and father. He continued to torture her, and other family members who loved the children, after he murdered them by perpetuating the lie that ‘Kim’ had the children. He laughed and told his wife the children would never be found. He has shown no remorse for his actions.”
(C. 894.)
A review of the circuit court’s entire sentencing order clearly shows that the circuit court did not apply any “nonstatuto-ry aggravating circumstances.” The above comments were made near the conclusion of the circuit court’s order and not in the section that specifically addresses the applicable aggravating circumstances. It is clear that the circuit court found that two aggravating circumstances were applicable in Huong’s case: (1) that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses, § 1-3A-5-49(8), Ala.Code 1975; and (2) that the four murders were committed pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code 1975. The circuit court found no other aggravating circumstances. There is no plain error in regard to this claim, and Luong is due no relief as to it.
I.
Luong next argues that the circuit court erred in relying on the jury’s verdict in the guilt phase for application of the aggravating circumstance of the death of two or more persons pursuant to one scheme or course of conduct.
As we stated in Part XIV.B of this opinion, it is not error for the circuit court to rely on the jury’s verdict in the guilt phase that Luong was guilty beyond a reasonable doubt of murdering the four children by one act or pursuant to one scheme or course of conduct.
Moreover,
“[O]ur statutes allow ‘double-counting1 or ‘overlap’ and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50[, Ala.Code 1975]. ‘The fact that a particular capital offense as defined in section 13A-5-40(a)[, Ala.Code 1975,] necessarily includes one or more aggravating circumstances as specified in section 13A-5-49[, Ala.Code 1975,] shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’ § 13A-5-50.”
Coral v. State, 628 So.2d 954, 965-66 (Ala.Crim.App.1992). No error, much less plain error, occurred in regard to this claim. Luong is due no relief.
XVII.
As required by § 13A-5-53, Ala. Code 1975, this Court must address the propriety of Luong’s capital-murder conviction and his sentence of death. Luong was indicted for, and convicted of, murdering his four children — four-month-old Danny Luong, one-year-old Lindsey Luong, two-year-old Hannah Luong, and three-year-old Ryan Phan — by one act or pursuant to one scheme or course of conduct, offenses defined as capital by § 13A-5-40(a)(10) and (a)(15), Ala.Code 1975. The jury, by a vote of 12 to 0, recommended that Luong be sentenced to death.
*232 The record reflects that Luong’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
The circuit court found' as aggravating circumstances that the murders were especially heinous, atrocious, or cruel, § 13A-5-49(8), Ala.Code 1975, and that the murders were committed pursuant to one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code 1975. In regard to statutory mitigating circumstances, the circuit court found that Luong had no significant’ history of prior criminal activity, § 13A-5-51, Ala.Code 1975, but gave this circumstance no weight. The circuit court also found the following non-statutory mitigating circumstances: Luong’s childhood problems, Luong’s drug abuse, Luong’s capacity for love and care, Luong’s mental and emotional problems, and mercy. (C. 38-40.)
This Court has independently weighed the aggravating and the mitigating circumstances as required by § ISA — 6—53(b)(2), Ala.Code 1975, and we are convinced, as was the circuit court, that death was the appropriate sentence for Luong’s senseless murder of four innocent young children.
Neither is Luong’s sentence disproportionate or excessive to penalties imposed in similar capital-murder cases. See § 13A-5 — 53(b)(3), Ala.Code 1975. See also Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010) (death sentence imposed for murder of six-year-old son); Johnson v. State, 40 So.3d 753 (Ala.Crim.App.2009) (death sentence for murder of six-month-old son); Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005) (death sentence for murder of two-year-old daughter).
Last, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that may have affected Luong’s substantial rights and have found none.
Luong’s convictions for five counts of capital murder and his sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.
WINDOM, P.J., recuses herself.

. “In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term 'plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts.” Bush v. State, 695 So.2d 70, 86 (Ala.Crim.App.1995).

. Before its amendment, Rule 19.3(a) required the consent of the defendant, his attorney, and the district attorney before a court could allow the jury to separate during a capital trial. However, the Supreme Court held in a case tried after the 1995 amendment to § 12-16-9 and before the 1997 amendment to Rule 19.3(a), that § 12-16-9, which conflicted with the rule of court governed. See Ex parte Stewart, 730 So.2d 1246, 1249 (Ala.1999).

. Rule 19.3(b), Ala. R.Crim. P., provides:
“In all cases, the court shall admonish the jurors that they are not:
"(l) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberations;
“(2) To converse with anyone else on any subject connected with the trial, until the case is submitted to them for deliberations;
. "(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
“(4) To form or express any opinion on the case until it is submitted to them for deliberation.”

.. In his initial brief, Luong does not identify any juror by initial or name but merely lists the pages in the supplemental record that correspond to juror questionnaires. Luong’s reply brief does identify some jurors.

. To protect the anonymity of the jurors, we are using their initials.

. One federal court for the circuit containing Alabama has recognized that a competency claim is reviewed on appeal using an abuse-of-discretion standard even if the issue was not first raised in the lower court. "Generally, we review an issue raised for the first timé on appeal only for plain error. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.2005). When reviewing a district court’s failure to order a competency hearing on its own motion, however, an abuse of discretion standard applies” United States v. D’Saronno, 562 Fed.App’x 954, 956 (11th Cir.2014) (not selected for publication in Federal Reporter), This Court has reviewed a competency issue using the plain-error standard of review. See Minor v. State, 780 So.2d 707, 728 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000).

. Rule 701, Ala. R. Evid,, states: "If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”

. We note that "[tjhere may be some instances when using ... pattern charges would be misleading or erroneous.” See Ex parte Wood, 715 So.2d 819, 824 (Ala.1998).

. The Alabama Supreme Court in Ex parte Carter, 889 So.2d 528 (Ala.2004), held that there was no plain error in the court’s failure , to give a jury instruction on circumstantial evidence when the case was based solely on circumstantial evidence, But see Ephraim v. State, 627 So.2d 1102, 1106 (Ala.Crim.App.1993) (“[T]he court's instruction on circumstantial evidence was incomplete because the court did not instruct the jury on the degree of proof necessary' to sustain a conviction based on circumstantial evidence.”).

. This section states that a person commits the crime of murder when, "[wjith intent to cause the death of another person, he or she causes the death of that person."

. This Court has also recognized that a circuit court’s removal of a juror during deliberations and replacement with an alternate may constitute harmless error, See Toombs v. State, 739 So.2d 550 (Ala.Crim.App.1999).

. Luong also makes several more arguments in this section of his brief. The arguments consist of one or two sentences each. We have reviewed all of the prosecutor’s arguments and find nothing that so infected the trial with unfairness that Luong was denied due process. See Darden v. Wainwright, 477 U.S. at 181.

. The record does contain an extensive report compiled by Dr. Doug McKeown, a former clinical and forensic psychologist with the Alabama Department of Mental Health.

. Luong was also evaluated by State forensic psychologist Dr. Doug McKeown. Dr. McKeown stated in his report that Luong "did not discuss any of the specific details associated with the actual events related to the current charges.” (C. 215.) Dr. McKeown concluded: "[0]ther than volitional substance abuse, no information is available that would suggest any aberrations of thought or other cognitive impairments that would have impaired [Luong] from appreciating the nature and quality of his actions and behavior in the time frame associated with [this] crime.” (C. 216.)

. Section 13A-5~51(1), Ala.Code 1975, "does not require a significant history of prior violent criminal activity.” Windsor v. State, 683 So.2d 1027, 1041 (Ala.Crim.App.1994).

. The record showed that the interpreter was given an oath; however, the oath was not contained in the certified record.